United States Court of Appeals,

Eleventh Circuit.

No. 95-8187.

R. Derry CROSBY, Plaintiff-Appellant,

v.

HOSPITAL AUTHORITY OF VALDOSTA AND LOWNDES COUNTY, D/B/A South Georgia Medical Center, Earl L. Creech, M.D., John R. Kendrick, M.D., Oscar E. Aguero, M.D., Archie L. Griffin, et al., Defendants-Appellees.

Sept. 11, 1996.

Appeal from the United States District Court for the Middle District of Georgia. (No. 90-CV-23-VAL), Wilbur D. Owens, Jr., Judge.

Before ANDERSON and BLACK, Circuit Judges, and HENDERSON, Senior Circuit Judge.

ANDERSON, Circuit Judge:

This case involves a doctor, R. Derry Crosby, who was denied staff privileges by the Hospital Authority of Valdosta and Lowndes County ("the Authority"). Dr. Crosby claimed that the Authority, its board members, and the individual doctors on hospital peer review committees (collectively "defendants") violated federal antitrust law when they denied his application for hospital privileges.[1] The district court granted defendants' motion for summary judgment on the ground that their actions were shielded by the doctrine of state action antitrust immunity. *Crosby v. Hospital Authority of Valdosta,* 873 F.Supp. 1568, 1581 (M.D.Ga.1995). We affirm.

I. FACTS

---

[1]Dr. Crosby presented other state law claims which are not relevant to this appeal.

Dr. Crosby graduated from West Virginia College of Osteopathy, an osteopathic medical school, where he earned a Doctor of Osteopathy ("D.O.") degree.[2]  Upon completion of medical school, Dr. Crosby completed a one year osteopathic internship at Memorial Hospital in York, Pennsylvania.  He remained at Memorial Hospital for another four years to complete an osteopathic orthopedic surgical residency program.

On September 20, 1986, Dr. Crosby applied for orthopedic surgical staff privileges at South Georgia Medical Center ("SGMC"), the hospital doing business for the Authority.  After review by numerous committees and the Authority, his application was denied.  Dr. Crosby contends that the doctors on the peer review committees which gave recommendations to the Authority and the Authority itself conspired to deprive him of staff privileges because he is not an allopathic doctor and as part of a conspiracy in restraint of trade in violation of 15 U.S.C.A. § 1, and monopolization (or an attempt to monopolize) in violation of 15 U.S.C.A. § 2.

---

[2]This case involves Crosby's claim that he was denied staff privileges because he was an osteopathic as opposed to an allopathic physician.  We have described the difference between the two as follows:

> Generally, osteopathy assists the body's remedial capabilities by focusing on the interaction of the biological systems and stressing musculoskeletal manipulative therapy, while allopathy treats disease by producing effects incompatible with the condition to be alleviated....  Although Georgia licenses both D.O.'s and M.D.'s to practice medicine, the state distinguishes between the two medical educations, referencing them separately in the licensing statutes. O.C.G.A. §§ 43-34-20(3), 43-34-26 (1984).

*Silverstein v. Gwinnett Hosp. Authority,* 861 F.2d 1560, 1563 (11th Cir.1988).

The context of this case makes it necessary to review the creation of hospital authorities in Georgia and the peer review process at SGMC and the Authority. The Authority was created pursuant to Georgia's Hospital Authorities Law, O.C.G.A. § 31-7-70 et seq. *See generally Cox Enterprises v. Carroll City/County Hosp. Auth.,* 247 Ga. 39, 273 S.E.2d 841, 844-45 (1981). Pursuant to the Hospital Authorities Law, the Georgia legislature "created in and for each county and municipal corporation of the state a public body corporate and politic to be known as the "Hospital Authority' of such county or city...." O.C.G.A. § 31-7-72(a). A hospital authority's board is appointed by the governing body of the county or municipal corporation in which it was created. *Id.* Hospital authority board members receive no compensation for their work, although they are permitted reimbursement for actual expenses. O.C.G.A. § 31-7-74(a). Hospital authorities are granted the same exemptions and exclusions from taxes as are granted to cities and counties for similar facilities. O.C.G.A. § 31-7-72(e).

A hospital authority is "deemed to exercise public and essential governmental functions and [has] all the powers necessary and convenient to carry out and effectuate the purposes and provisions of [the Hospital Authorities Law]." O.C.G.A. § 31-7-75. These powers include, in addition to those necessary to operate a hospital, the power to sue and be sued, to execute contracts, to exercise the right of eminent domain, to receive proceeds from the sale of general obligation or county bonds, and to issue revenue anticipation certificates or other evidence of indebtedness. *Id.* An authority may not operate for profit, but rather, must adjust

its prices to produce only enough revenue to cover costs with reasonable reserves. O.C.G.A. § 31-7-77. Hospital authorities are authorized to sell "negotiable revenue anticipation certificates" for the purpose of funding their activities. O.C.G.A. §§ 31-7-75(16), 31-7-78. These certificates, however, are not a debt of the city, the county, the State, or any political subdivision. O.C.G.A. § 31-7-79. Although not a debt of any "political subdivision," these certificates "are declared to be issued for an essential public and governmental purpose and together with interest thereon and income therefrom, [are] exempt from all taxes." O.C.G.A. § 31-7-79. Although an authority does not have the power to tax, counties and cities possess the power to levy an ad valorem tax for the purpose of contracting with the authority for the provision of specific services. O.C.G.A. § 31-7-84(a). Indeed, counties and their component municipalities are specifically authorized to contract with hospital authorities for the purpose of providing medical care to indigent residents of that county or municipality. O.C.G.A. § 31-7-85. Upon dissolution, a hospital authority is not authorized, in the absence of other specific legislation, to convey any of its property to a private person, association, or corporation. O.C.G.A. § 31-7-89. Finally, the board of trustees of each authority is required to file with the governing body of the particular municipality an annual report of its activities. O.C.G.A. § 31-7-90.

Dr. Crosby's application for staff privileges was governed by

the bylaws of SGMC's medical staff (the "Bylaws").[3] In particular, Article X, § 2(b)(4) sets forth educational and other related requirements for orthopedic surgeons applying for staff privileges: "Physicians applying for Staff Membership in the specialty of Orthopedics must demonstrate by training, experience, and performance the requirements for eligibility in the specialty as designated by the American Board of Orthopedics and be either board certified or board eligible." (Bylaws, Art. X, § 2(b)(4)).

Pursuant to the Bylaws, Dr. Crosby's application for staff privileges was reviewed by the following committees of the medical staff: (1) the Orthopedic Service of the Department of Surgery; (2) the Credentials Committee; (3) the Executive Committee; and (4) the Ad Hoc Hearing Committee. The Orthopedic Service recommended denial of Dr. Crosby's application because he did not have the background (i.e., training, experience, and performance) required by the Bylaws.[4] In addition, the Orthopedic Service stated that its decision was based on its determination that there were a sufficient number of orthopedic surgeons already on the hospital staff. Next, the Credentials Committee recommended denial of Dr. Crosby's application for failure to comply with the Bylaws'

---

[3]All members of the medical staff agreed to abide by the Bylaws. Further, the Bylaws were adopted and approved by the Authority.

[4]Specifically, Dr. Crosby was not "board certified or board eligible" as designated by the American Board of Orthopedics ("ABO") because he had not completed an osteopathic orthopedic residency training program that was approved by the ABO. Accordingly, the Orthopedic Service concluded, in part, that Dr. Crosby did not satisfy the Bylaws' residency requirements.

orthopedic residency requirements.[5]   The Executive Committee reviewed the Credentials Committee's denial and affirmed its conclusion.  The Ad Hoc Hearing Committee then conducted a hearing and concluded that the recommendation of the Executive Committee was appropriate.  Pursuant to the Bylaws, the application was referred back to the Executive Committee, which voted to uphold the Ad Hoc Hearing Committee's recommendation of denial on the grounds that Dr. Crosby failed to meet the criteria established by the Bylaws.

Finally, the Authority, acting through its Appellate Review Committee, conducted a thorough hearing[6] during which it considered Dr. Crosby's application in light of the recommended denial by the staff committees.[7]   As a result of this hearing, the Authority unanimously voted to deny Dr. Crosby's application.  It stated its grounds for this denial as follows:

> (1) The medical staff of South Georgia Medical Center, through its Executive Committee, has found that the applicant has not demonstrated by training, experience and performance the requirements for eligibility in the specialty of orthopedics.
>
> (2) The applicant has not met the "burden" placed on him by Article V, § 1, b of the Medical Staff Bylaws of South Georgia Medical Center.

---

[5]In other words, the recommendation of the Credentials Committee dropped the Orthopedic Service's second ground for denying Dr. Crosby's application.

[6]Dr. Crosby was represented by counsel at this hearing.

[7]Under the Bylaws, although the various staff committees provide recommendations to the Authority, the Authority wields ultimate decisionmaking power over staff credentialing decisions. (Bylaws, Article V, § 2).  In this regard, the Authority exercises meaningful control over the ultimate decision.  It has the power to follow, modify, or even disregard staff committee recommendations.  (*Id.* at Article V, § 2(g)-(j)).

(3) The applicant fails to meet the requirements of Article X, § 2, b.—Surgical Service, 4., in that he has not demonstrated that he is either Board Certified or Board Eligible by the American Board of Orthopedics.

Thereafter, on March 14, 1990, Dr. Crosby filed the present action against three groups of defendants: 1) the Authority, d/b/a South Georgia Medical Center; 2) the board members of the Authority; and 3) the physicians who participated in the various review committees. He alleged violations of federal antitrust law (restraint of trade and monopolization) and Georgia law.[8]

The district court, in a well-reasoned opinion, granted summary judgment, holding that all defendants were immune from suit by virtue of state action immunity under *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and its progeny. *Crosby,* 873 F.Supp. at 1580-81. The Authority and its members, it reasoned, were a "political subdivision" of the State and Georgia had clearly articulated a policy authorizing the challenged anticompetitive conduct. *Id.* at 1575-81. Further, it found that the individual staff members on peer review committees, because they acted as the Authority's agents, were protected by the Authority's state action immunity. *Id.* at 1576-77. Finally, the court held that, even if defendants were not entitled to state action immunity, they were immune from damages under the Local Government Antitrust Act ("LGAA"), 15 U.S.C.A. §§ 35-36, and the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C.A. §§ 11101-11152. *Crosby,* 873 F.Supp. at 1581-84. On appeal, Dr.

---

[8]By consent of parties, Dr. Crosby abandoned all but his federal antitrust claims. *Crosby,* 873 F.Supp. at 1570.

Crosby challenges each of these determinations.[9]

## II. DISCUSSION

A. *State Action Immunity*

We review *de novo* the district court's grant of summary judgment to defendants on their state action immunity defense. *FTC v. Hospital Board of Directors of Lee County,* 38 F.3d 1184, 1187 (11th Cir.1994) (citation omitted); *Bolt v. Halifax Hosp. Medical Ctr.* ("*Bolt IV* "), 980 F.2d 1381, 1384 (11th Cir.1993). Under the state action immunity doctrine, also known as the *Parker* doctrine, states are immune from federal antitrust law for their actions as sovereign. *Parker v. Brown,* 317 U.S. 341, 351-53, 63 S.Ct. 307, 314, 87 L.Ed. 315 (1943); *Lee County,* 38 F.3d at 1187. The doctrine is grounded in and derived from principles of federalism and state sovereignty. *Parker,* 317 U.S. at 350-52, 63 S.Ct. at 313-14.

The state action immunity doctrine "does not apply *directly* to a state's political subdivisions because these subdivisions "are not themselves sovereign;  they do not receive all the federal deference of the States that create them.' " *Lee County,* 38 F.3d at 1187 (quoting *City of Lafayette, La. v. Louisiana Power & Light Co.,* 435 U.S. 389, 412, 98 S.Ct. 1123, 1136, 55 L.Ed.2d 364 (1978)). Accordingly, actions by the State and actions by municipalities are evaluated under different standards. The *Parker* doctrine "exempts ... anticompetitive conduct engaged in as an act

---

[9]Because we affirm the district court's ruling with respect to state action immunity and immunity from damages under the LGAA, we need not reach its decision regarding immunity under the HCQIA.

of government by the State as sovereign, or by its subdivisions pursuant to state policy to displace competition with regulation or monopoly public service." *City of Lafayette,* 435 U.S. at 413, 98 S.Ct. at 1137 (Brennan, J., plurality opinion). The extension of *Parker* immunity to political subdivisions reflects the Court's conclusion that because "[m]unicipal corporations are instrumentalities of the State for the convenient administration of government within their limits, [cit.], the actions of municipalities may reflect state policy." *Id.* (citation omitted).

Accordingly, the Court has made clear that a municipality[10] is entitled to state action immunity if it acted pursuant to "clearly articulated and affirmatively expressed state policy." *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 46-47, 105 S.Ct. 1713, 1720, 85 L.Ed.2d 24 (1985); *City of Lafayette,* 435 U.S. at 410, 98 S.Ct. at 1135; *see also Bolt IV,* 980 F.2d at 1385-86.[11]

_____

[10]We use the terms "municipality" and "political subdivision" interchangeably throughout this opinion. *Cf. Askew v. DCH Regional Health Care Authority,* 995 F.2d 1033, 1037 (11th Cir.), *cert. denied,* 510 U.S. 1012, 114 S.Ct. 603, 126 L.Ed.2d 568 (1993) ("Ordinarily, when a local government entity seeks immunity from antitrust liability, it must show that it is a political subdivision of the state and that the challenged conduct is authorized under a "clearly articulated and affirmatively expressed policy of the state.' "); *Bolt IV,* 980 F.2d at 1385 ("Political subdivisions, including municipalities, ... can obtain protection under the state-action immunity doctrine if they can "demonstrate that [they acted pursuant to a clearly articulated stated policy displacing competition with regulation].' ").

[11]In *City of Lafayette,* the Court suggested that state action immunity would apply to a municipality only if: (1) the municipality acted pursuant to clearly articulated and affirmatively expressed state policy; and (2) the anticompetitive conduct was actively supervised by the State. 435 U.S. at 410, 98 S.Ct. at 1135. In *Town of Hallie,* the Court held that only the first of the these two prongs applies to municipalities. 471 U.S. at 46-47, 105 S.Ct. at 1720. In

Private parties are entitled to even less federal deference than either the State or its political subdivisions. When a private party seeks the protection of state action immunity, it must show both that: (1) the challenged restraint was clearly articulated and affirmatively expressed as state policy; and (2) the policy was actively supervised by the state. *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980). In *Town of Hallie,* the Court explained that the second prong of the *Midcal* test, the active state supervision requirement, is unnecessary when the actor is a municipality because whereas there is a real danger that a private party acts to further his or her own interest rather than the governmental interests of the State, there is less danger that a municipality is involved in a *private* price-fixing arrangement. 471 U.S. at 47, 105 S.Ct. at 1720. Although there is some danger that a municipality will pursue its own goals rather than those of the State,[12] this concern is addressed by the first prong of the *Parker* doctrine, i.e., the municipality must act pursuant to clearly articulated state policy.

In sum, a greater level of state involvement in the anticompetitive conduct must be demonstrated if the defendant is a

*California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980), the Court held that both prongs apply to private parties.

[12]*Cf. City of Lafayette,* 435 U.S. at 412-13, 98 S.Ct. at 1136-37 ("In light of the serious economic dislocation which could result if cities were free to place their own parochial interests above the Nation's economic goals reflected in the antitrust laws, ... we are especially unwilling to presume that Congress intended to exclude anticompetitive municipal action from their reach.").

private party rather than a political subdivision.   If the defendant is a "political subdivision," it travels under the single-prong *Town of Hallie* test (i.e., the defendant must show "clear articulation").   If the defendant is a private party, it travels under the two-prong *Midcal* test (i.e., defendant must show both "clear articulation" and "active state supervision"). Accordingly, we must determine whether the Authority, its board members and SGMC's staff members should be evaluated as a political subdivision or as private actors.

B. *Political Subdivision or Private Actors?*

1. *The Authority and its Board Members*

The district court found that the Authority is a political subdivision of Georgia.   It based its decision on several cases involving similar issues in Alabama and Florida.  *See FTC v. Hosp. Board of Directors of Lee County,* 38 F.3d 1184 (11th Cir.1994); *Askew v. DCH Reg. Health Care Authority,* 995 F.2d 1033 (11th Cir.), *cert. denied,* 510 U.S. 1012, 114 S.Ct. 603, 126 L.Ed.2d 568 (1993); *Todorov v. DCH Healthcare Authority,* 921 F.2d 1438 (11th Cir.1991); *see also Sweeney v. Athens Regional Medical Center,* 705 F.Supp. 1556, 1565 (M.D.Ga.1989) (interpreting Georgia statute).

In determining whether the Authority is a "political subdivision" for purposes of state action immunity, we are guided by *Town of Hallie,* 471 U.S. at 46-47, 105 S.Ct. at 1720.   There, the Court held that municipalities, and perhaps state agencies, need not satisfy the active state supervision requirement. *Id.* It based its conclusion on the realization that states often act through their municipalities and, accordingly, action by a

municipality often is equivalent to action by the State as sovereign.

> Where a private party is engaging in the anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State. Where the actor is a municipality, there is little or no danger that it is involved in a *private* price-fixing arrangement. The only real danger is that it will seek to further purely parochial public interests at the expense of more overriding state goals. This danger is minimal, however, because of the requirement that the municipality act pursuant to a clearly articulated state policy. Once it is clear that state authorization exists, there is no need to require the State to supervise actively the municipality's execution of what is a properly delegated function.

*Id.* at 47, 105 S.Ct. at 1720. The Court discounted the importance of active supervision in the context of examining a political subdivision's actions, noting that the "requirement of active state supervision serves essentially an evidentiary function: it is one way of ensuring that the actor is engaging in the challenged conduct pursuant to state policy." *Id.* at 46, 105 S.Ct. at 1720. Such evidence is not necessary where a political subdivision, a creation and arm of the State, acts pursuant to clearly articulated state policy. *See Hass v. Oregon State Bar,* 883 F.2d 1453, 1461 (9th Cir.1989), *cert. denied,* 494 U.S. 1081, 110 S.Ct. 1812, 108 L.Ed.2d 942 (1990).

We have held that state hospital authorities can be political subdivisions for purposes of state action immunity. *See, e.g., Askew,* 995 F.2d at 1037-38. Of course, this does not end the inquiry; in each case we must examine the State's statutes to determine whether the actor is a "political subdivision," i.e., whether imposition of the active state supervision requirement is necessary to determine whether the challenged actions are those of

the State as sovereign.[13]

The Authority was created pursuant to O.C.G.A. § 31-7-72 which

provides, in relevant part:

> (a) There is created in and for each county and municipal corporation of the state a public body corporate and politic to be known as the "hospital authority" of such county or city, which shall consist of a board of not less than five nor more than nine members to be appointed by the governing body of the county or municipal corporation of the area of operation for staggered terms as specified by resolution of the governing body....

> (e) Nothing in this Code section is intended to invalidate any of the acts of existing boards of authorities.  Hospital authorities shall be granted the same exemptions and exclusions from taxes as are now granted to cities and counties for the operation of facilities similar to facilities to be operated by hospital authorities as provided for under this Title.

Further, O.C.G.A. § 31-7-75 provides, in relevant part:

> Every hospital authority shall be deemed to exercise public and essential governmental functions and shall have all the powers necessary or convenient to carry out and effectuate the purposes and provisions of this Article.

The Authority concludes from this language that, because hospital

authorities are public bodies, they also must be political

subdivisions of the State for purposes of *Parker* immunity.  *See FTC*

*v. Hospital Board of Directors of Lee County,* 38 F.3d 1184, 1188

(11th Cir.1994) (concluding that a health care authority was a

"political subdivision" subject to the single-prong test because it

---

[13]Appellees cite a number of factually-distinguishable cases for the proposition that "hospital authorities" in general are political subdivisions.  In *Todorov v. DCH Healthcare Authority*, 921 F.2d 1438 (11th Cir.1991) and *Askew, supra,* for example, we examined hospital authorities created by the Alabama Health Care Authorities Act.  This Act specifically provided that Alabama's hospital authorities acted as political subdivisions of the State when exercising their powers, even if such exercise violated federal antitrust law.  These cases are not dispositive because Georgia's statutes are not nearly so explicit.

was a special purpose unit of local government).

Dr. Crosby argues that the Georgia Supreme Court has conclusively determined that Georgia hospital authorities are not "political subdivisions" for purposes of state action immunity. *See Thomas v. Hospital Authority,* 264 Ga. 40, 440 S.E.2d 195 (1994). In *Thomas,* the court examined whether a hospital authority in Georgia was entitled to sovereign immunity from an action arising out of a slip and fall injury. The court examined Art. I, § 2, ¶ 9(e) of the Georgia Constitution, which provides, in relevant part: "Sovereign immunity extends to the state and all of its departments and agencies." The court held that "hospital authorities, because they are neither the State nor a department or agency of the State, are not entitled to the defense of sovereign immunity." *Thomas,* 440 S.E.2d at 196. The court unambiguously stated that "neither the language of [the code section] which refers to a hospital authority as a "body corporate and politic,' nor that which assigns to it "public and essential governmental functions' is sufficient to constitute it a political subdivision of the state...." *Id.* (quotation omitted). The court concluded that the hospital authority was not a "political subdivision": "[T]here is a clear distinction between a political subdivision such as a county and a corporate body such as a hospital authority, which is a creation of the county." *Id.*

*Thomas* indicates that Georgia does not consider its hospital authorities to be "political subdivisions" for purposes of sovereign immunity under the Georgia Constitution. In *Thomas,* the court supported its conclusion by reference to the public policy

underlying sovereign immunity in Georgia. *Id.,* 440 S.E.2d at 196-97. It found that a hospital authority's functions are not the type of conduct Georgia's doctrine of sovereign immunity was designed to protect. Sovereign immunity was intended to protect the government from lawsuits as it goes about the business of governing. *Id.* By contrast,

> [t]he operation of a hospital is not the kind of function, governmental or otherwise, entitled to the protection of sovereign immunity. The very functions performed by the Hospital Authority are performed by private hospitals and the Hospital Authority is in direct competition with these private hospitals for patients.[ ] If an instrumentality of the government chooses to enter an area of business ordinarily carried on by private enterprise, i.e., engage in a function that is not "governmental," there is no reason why it should not be charged with the same responsibilities and liabilities borne by a private corporation.

*Id.,* 440 S.E.2d at 197.

We recognize that the decision to "authorize" anticompetitive conduct is wisely left to the State. *See FTC v. Ticor Title Insurance Co.,* 504 U.S. 621, 636, 112 S.Ct. 2169, 2178, 119 L.Ed.2d 410 (1992) (emphasizing that careful application of state action immunity doctrine insures that the State remains responsible "for the price fixing it has sanctioned and undertaken to control"). However, the definition of "political subdivisions" for purposes of state sovereign immunity does not control its definition for purposes of antitrust state action immunity. As directed by *Town of Hallie,* 471 U.S. at 46-47, 105 S.Ct. at 1720, we focus instead on whether the nexus between the State and the Authority is sufficiently strong that there is little real danger that the Authority is involved in a *private* price-fixing arrangement. *See id.*

Georgia public purpose authorities are unique entities, lying somewhere between a local, general-purpose governing body (such as a city or county) and a corporation. *See generally* Paul W. Bonapfel, "The Legal Nature of Public Purpose Authorities: Governmental, Private or Neither?" 8 Ga.L.Rev. 680 (1974) ("An authority is [typically] an entity possessing both corporate and governmental characteristics and created by general purpose governments to accomplish specific purposes...."). Indeed, although Georgia's hospital authorities possess many of the attributes of a sovereign, they are clearly limited in their character and are private actors in many respects.

In *Thomas,* the court focused on the fact that hospital authorities have a separate existence from the State, i.e., they are an instrumentality created by the State and county for a special purpose. In other contexts, however, the Georgia Supreme Court has recognized that hospital authorities are governmental entities. For example, in *Martin v. Hospital Authority of Clarke County,* 264 Ga. 626, 449 S.E.2d 827, 828 (1994), a case decided after *Thomas,* the Georgia Supreme Court held that hospital authorities are not liable for punitive damages because they are "governmental entit[ies]." Indeed, the fact that hospital authorities are governmental entities is demonstrated by the statutes creating and regulating them. The Georgia Supreme Court has summarized those factors illustrating the Authority's governmental nature:

> Factors tending to establish the Authority's governmental nature include that it is a creature of statute; that it is defined as a "*public* body corporate and *politic* " (emphasis supplied); that its Board is appointed by the governing body

of the relevant political subdivision or subdivisions; that it is tax exempt; that it is deemed to exercise public and essential governmental functions; that it may exercise the power of eminent domain; that it receives tax revenues; and that the governing bodies of the relevant political subdivisions have a role in determining the disposition of its property upon dissolution.

*Cox Enterprises v. Carroll City/County Hospital Authority,* 247 Ga. 39, 273 S.E.2d 841, 845 (1981). After careful analysis, the court in *Cox Enterprises,* concluded that hospital authorities are instrumentalities of the state, i.e., they are the manner in which the state has determined to conduct its business. *Id.,* 273 S.E.2d at 846. Accordingly, the court held that, as a governmental entity, the authority's attempt to bring a libel action was unconstitutional. *Id.*

We are satisfied that the Authority is an instrumentality, agency, or "political subdivision" of Georgia for purposes of state action immunity; thus, we need not apply the active state supervision requirement. Although *Thomas* held that hospital authorities are not part of the State or county for purposes of state sovereign immunity, the different policy reasons underlying state action immunity indicate that Georgia's hospital authorities are political subdivisions for state action immunity purposes. As noted above, this determination is guided by the rationale of *Town of Hallie.* Applying that rationale, we conclude that the nexus between the State and the Authority is sufficiently strong that, when combined with a clearly articulated policy in favor of the challenged anticompetitive conduct, there is little danger that it is involved in a *private* price fixing arrangement. *See Town of Hallie,* 471 U.S. at 47, 105 S.Ct. at 1720. *Cf. Porter Testing*

*Laboratory v. Board of Regents,* 993 F.2d 768, 772 (10th Cir.), *cert. denied,* 510 U.S. 932, 114 S.Ct. 344, 126 L.Ed.2d 309 (1993) (holding that the active state supervision requirement applies only to purely private parties).

Georgia has chosen to operate its hospitals through the instrumentality of hospital authorities and, accordingly, it has clothed these authorities with certain necessary governmental qualities. *Cf. Cox Enterprises,* 273 S.E.2d at 846 ("Certainly the government is authorized to operate hospitals, either directly or, as here, indirectly."). Although hospital authorities may not possess all of the powers enjoyed by municipalities or by the State, they enjoy numerous governmental powers. Further, the legislature has unambiguously stated that they are "public bodies" which exercise "public and essential governmental functions." O.C.G.A. §§ 31-7-72, 31-7-75. Georgia has also empowered hospital authorities to act as market participants in several respects by granting them several powers which resemble those of a private corporation. The mere grant of such powers, however, does not transform an otherwise governmental entity into a private actor of the type we would expect to engage in a private price-fixing agreement. The governmental powers enjoyed by the Authority are similar in material respects to those of a hospital that is directly operated by the State. None of its non-governmental aspects create a danger that it is involved in a private price-fixing arrangement.

The policy rationale employed by the court in *Thomas,* does not aid Dr. Crosby's cause. The fact that the Authority engages in

the competitive business of health care, or operating a hospital, does not remove it from the protective cloak of state action immunity.  It is axiomatic that state action immunity includes protection for states when they engage in business.  To follow the policy rationale in *Thomas* and withhold immunity in those cases where the state chooses "to enter an area of business ordinarily carried on by private enterprise," would be to virtually eliminate state action immunity altogether.[14]

Accordingly, we hold that the Authority is a "political subdivision" of Georgia such that it is unnecessary to apply *Midcal*'s active state supervision requirement.  Further, there has been no argument that we should apply a different test to the Authority's board members, and we decline to do so.

### 2. *Members of peer review committees*

Appellants also argue that the district court erred in its determination that the individual doctors who served on the various peer review committees were agents of the Authority and, therefore, were entitled to the single-prong *Town of Hallie* test.  *See Crosby*, 873 F.Supp. at 1576.  The district court relied on *Cohn v. Bond*, 953 F.2d 154, 158 (4th Cir.1991), *cert. denied*, 505 U.S. 1230, 112 S.Ct. 3057, 120 L.Ed.2d 922 (1992), for the conclusion that individual hospital staff members in this case should be treated as the Authority's agents, i.e., as a political subdivision, for state

[14]The parties have not argued and we decline to address the Supreme Court's invitation to employ a "market participant" exception to state action immunity. *See City of Columbia v. Omni Outdoor Advertising,* 499 U.S. 365, 374-75, 379, 111 S.Ct. 1344, 1351, 1353, 113 L.Ed.2d 382 (1991). *See also Genentech, Inc. v. Eli Lilly and Co.,* 998 F.2d 931, 948 (Fed.Cir.1993), *cert. denied,* 510 U.S. 1140, 114 S.Ct. 1126, 127 L.Ed.2d 434 (1994).

action immunity purposes.

In *Cohn,* the Fourth Circuit held that medical staff members of a municipally owned and operated hospital, when making their recommendations to deny hospital privileges, acted as agents of that hospital. *Id.* at 157-58.

> [W]hen members of the medical staff recommend action on an application for privileges, as authorized by the municipal hospital, they are acting in their capacity as employees, as opposed to private parties. [*Oksanen v. Page Mem. Hosp.,* 945 F.2d 696 (4th Cir.1991) (en banc), *cert. denied,* 502 U.S. 1074, 112 S.Ct. 973, 117 L.Ed.2d 137 (1992) ]. Physicians who make peer review decisions at the behest of, or by delegation from, the hospital's board of trustees, are acting as agents of the hospital and are, therefore, indistinguishable from the hospital.

*Id.* Because the doctors were agents of the hospital, the court held that the "active supervision" prong was inapplicable. *Id.* at 158-59. "The actions of the staff are immune when as is true here, they are acting as agents of ... a municipal hospital ... in making their recommendations." *Id.* The court relied exclusively on *Oksanen, supra,* for its conclusion that physicians on peer review committees act as agents of the hospital. *Cohn,* 953 F.2d at 158 ("As previously discussed, members of the medical staff acted as agents of [the] Hospital in making their recommendation to deny hospital privileges. The second, "active supervision" prong is, therefore, inapplicable in this case.").

In *Oksanen,* the Fourth Circuit examined whether plaintiff had established the existence of a contract, combination, or conspiracy under section one of the Sherman Act. 945 F.2d at 702. Section one of the Sherman Act does not apply to unilateral action; it proscribes only concerted action which imposes an unreasonable restraint on trade. *Monsanto Co. v. Spray-Rite Service Corp.,* 465

U.S. 752, 760-61, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984); *Albrecht v. Herald Co.,* 390 U.S. 145, 148, 88 S.Ct. 869, 871, 19 L.Ed.2d 998 (1968). Under the intraenterprise immunity doctrine announced in *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 768-69, 104 S.Ct. 2731, 2740-41, 81 L.Ed.2d 628 (1984), unilateral actions of a single enterprise do not constitute the type of concerted action proscribed by section one of the Sherman Act. Accordingly, an officer and an employee of the same company are legally incapable of conspiring with one another. *Id.* at 769, 104 S.Ct. at 2741. ("[O]fficers or employees of the same firm do not provide the plurality of actors imperative for a § 1 conspiracy.") (citation omitted). In *Copperweld,* the Court emphasized that an "internal "agreement' to implement a single, unitary firm's policies" does not raise the anticompetitive concerns targeted by the Sherman Act. *Id.* at 769, 104 S.Ct. at 2740. "The officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals." *Id.* at 769, 104 S.Ct. at 2740-41. Likewise, coordinated conduct of a corporation and its unincorporated divisions or its wholly owned subsidiaries does not constitute a conspiracy, but rather, unilateral conduct. *Id*. at 771, 104 S.Ct. at 2741-42:

> A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousness, but one.... With or without a formal "agreement," the subsidiary acts for the benefit of the parent, its sole shareholder. If a parent and a wholly owned subsidiary do "agree" to a course of action, there is no sudden joining of economic resources that had

previously served different economic interests, and there is no justification for § 1 scrutiny.

*Id.*

In *Oksanen,* the court held that, under *Copperweld* 's intraenterprise immunity doctrine, a hospital and its medical staff lack the capacity to conspire during the peer review process. 945 F.2d at 703. In examining the relationship between a hospital and its medical staff during the peer review process, the court concluded that the medical staff works "as the Board's agent under an "internal "agreement' to implement a single, unitary firm's policies' of evaluating the conduct and competence of those to whom the hospital extends privileges." *Id.* (quoting *Copperweld,* 467 U.S. at 769, 104 S.Ct. at 2740). As such, "the peer review process does not represent the sudden joining of independent economic forces that section one is designed to protect." *Id.;  see also Copperweld,* 467 U.S. at 767-69, 104 S.Ct. at 2740. Instead, the hospital and its medical staff display a unity of interest when the staff take part in hospital management decisions. *Oksanen,* 945 F.2d at 703. In addition, the court found it relevant to the *Copperweld* inquiry that the hospital retained ultimate control over staff credentialing decisions. *Id.* at 704 ("In *Copperweld,* the parent corporation's ability to exercise control over its subsidiary if the subsidiary failed to act in its best interests influenced the Court's decision that the coordinated activity of the two entities should be treated as that of a single entity.") (citing *Copperweld,* 467 U.S. at 769-73, 104 S.Ct. at 2741-42).

The holding in *Oksanen* dictated the result in *Cohn.* If a hospital and its staff during the course of peer review are

functionally one entity, then, *a fortiori,* the staff members are (at the very least) agents of the hospital during peer review. Accordingly, *Cohn* 's rationale persuades us only to the extent this circuit has embraced the rationale of *Oksanen.*

This circuit's counterpart to *Oksanen* is *Bolt v. Halifax Hosp. Medical Center (Bolt III),* 891 F.2d 810, 819 (11th Cir.1990), *implicitly overruled in part by City of Columbia v. Omni Outdoor Advertising,* 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991). *Bolt III* involved a physician whose medical staff privileges had been revoked at three different hospitals. The plaintiff-physician brought an antitrust action against the hospitals, their medical staffs, and a local medical society. In our first panel opinion, we held that the hospitals and their medical staffs were immune from suit under state action immunity. *See Bolt v. Halifax Hosp. Medical Center (Bolt I),* 851 F.2d 1273, 1284 (11th Cir.1988). *Bolt I* was vacated when the case was taken en banc. *See Bolt v. Halifax Hosp. Medical Center,* 861 F.2d 1233, 1234 (11th Cir.1988). Before the en banc court, the hospitals and their medical staffs withdrew their arguments based on state action immunity. The en banc court directed the panel to reconsider its opinion in light of this explicit waiver. *See Bolt v. Halifax Hosp. Medical Center (Bolt II),* 874 F.2d 755, 756 (11th Cir.1989) (en banc). Accordingly, on remand in *Bolt III,* the panel considered the case anew, largely without state action immunity.[15]

---

[15]State action immunity remained an issue in the case as to one of the hospital defendants who had presented a new state-action argument in its brief on rehearing en banc. *Bolt III,* 891 F.2d at 818 n. 12, 823 n. 22.

In particular, in *Bolt III* we considered whether plaintiff had made out the contract, combination, or conspiracy element of his Sherman Act claim. Like the court in *Oksanen,* we examined *Copperweld* 's intraenterprise immunity doctrine in the context of peer review credentialing decisions. Noting that the "directed verdicts in this case would ... have been proper if, as the defendants contend, the [hospital] defendants were legally incapable of concerted action within the meaning of section 1 of the Sherman Act," the court in *Bolt III* examined whether such a conspiracy was possible. 891 F.2d at 818-19. The court rejected application of the intraenterprise immunity doctrine on the ground that the analogy between a corporation and its officers (or subsidiaries) and a hospital and its medical staff was inapt in some circumstances.

> The rule for corporations is based on considerations unique to the corporate context. Theoretically, a "conspiracy" involving a corporation and one of its agents would occur every time an agent performed some act in the course of his agency, for such an act would be deemed an act of the corporation. Thus, the rule that a corporation is incapable of conspiring with its agents is necessary to prevent erosion of the principle that section 1 does not reach unilateral acts. A hospital and the members of its medical staff, in contrast, are legally separate entities, and consequently no similar danger exists that what is in fact unilateral activity will be bootstrapped into a "conspiracy." *See Oltz v. St. Peter's Community Hospital,* 861 F.2d 1440, 1450 (9th Cir.1988).

*Id.* at 819. *Cf. St. Joseph's Hosp., Inc. v. Hospital Corp. of America,* 795 F.2d 948, 956 (11th Cir.1986) ("[W]hile a corporation's officers and its employees are legally incapable of conspiring among themselves, if the "officers or employees act for their own interests, and outside the interests of the corporation, they are legally capable of conspiring with their employees for

purposes of Section 1.' ") (quotation omitted). Further, because each member of the medical staff practiced medicine individually, the court concluded that each is a "separate economic entity potentially in competition with other physicians." *Bolt III,* 891 F.2d at 819.[16] Unlike *Oksanen, Bolt III* rejected application of the intraenterprise immunity doctrine to agreements between a hospital and its staff regarding staff privilege decisions.

Relying on *Bolt III,* in *Todorov v. DCH Healthcare Authority,*

---

[16]The court in *Bolt III* also examined whether one of the hospital defendants was entitled to state action immunity. *Id.* at 823-25. *See supra* note 15. It held that the Florida legislature had not clearly articulated a policy to displace competition because it had not foreseen that the hospital would conspire with its medical staff to deny plaintiff staff privileges on pretextual grounds. 891 F.2d at 825. Accordingly, because the State had not foreseen that particular *type* of anticompetitive conduct, the court found that the hospital was not protected by *Parker* immunity. However, in *Bolt v. Halifax Hosp. Medical Center (Bolt IV )*, 980 F.2d 1381 (11th Cir.1993), we held that the Supreme Court in *City of Columbia* rejected this part of *Bolt III:*

> [T]he Court [in *City of Columbia* ] rejected federal judicial inquiry into the state officials' intent in undertaking he challenged action. Such an inquiry, the Court stated, "would require the sort of deconstruction of the governmental process and probing of the official "intent' that we have consistently sought to avoid." [Cit.] ...
>
> The inquiry into whether the reasons for [the hospital's] denial of staff privileges were pretextual would require probing into the "official intent" of HHMC, an inquiry expressly denounced by the Supreme Court. [Cit.]

*Bolt IV,* 980 F.2d at 1388 (quotation omitted). Accordingly, we held that *City of Columbia* implicitly overruled *Bolt III* in part.

*City of Columbia* left untouched, however, *Bolt III* 's rejection of *Copperweld* 's intraenterprise immunity doctrine in the context of hospital peer review decisions. This portion of *Bolt III* remains the law of this circuit.

921 F.2d 1438, 1446 n. 13 (11th 1991), we held that the individual doctors on the medical staff of defendant hospital were separate economic actors, not employees of the hospital, when they performed the challenged actions, and, therefore, were not entitled to share in the hospital's state action immunity. *Id.* at 1446 n. 13. Plaintiff in *Todorov* was a doctor of neurology and a staff member of the DCH Regional Medical Center (DCH), where he had been granted privileges to practice neurology. After becoming a member of the hospital staff, plaintiff applied for the privilege to perform certain procedures in DCH's radiology department.[17] After review of his application, the credentials committee sought recommendations from two of the physicians plaintiff had named as references; both were radiologists who practiced at DCH. These doctors did not recommend plaintiff. Indeed, they questioned his technical competence. The credentials committee then solicited the advice of the chairman of DCH's radiology department, who also recommended denial of plaintiff's application for privileges. The hospital, acting on the recommendation of the final peer committee to review plaintiff's case, denied plaintiff's application. Plaintiff initiated an action against DCH and the three radiologists who provided the negative recommendations. The district court held that DCH was immune from antitrust liability under the *Parker* doctrine because it was a local governmental entity and had acted pursuant to state authority in denying plaintiff's application for privileges. 921 F.2d at 1445. It also

---

[17]The hospital bylaws at DCH required a peer review process for credentialing decisions that was similar in relevant respects to the process at issue in the instant case.

held that the individual radiologists were immune because they were "acting as employees of DCH and, as such, enjoyed DCH's immunity."[18] *Id.* at 1446. On appeal, this Court agreed that DCH was entitled to state action immunity; but, relying on *Bolt III,* we rejected the district court's rationale with respect to the radiologists' immunity:

> In [*Bolt III* ], we held that members of a hospital's medical staff should be considered independent legal entities for antitrust purposes if they are not employed by the hospital and are acting as separate economic actors.... Here, the physicians are separate economic actors; thus, their actions are legally distinct from the hospital's actions. Accordingly, the district court could not properly base its summary judgment on the ground that the radiologists and DCH were a single legal entity.

*Id.* at 1446 n. 13.

The foregoing discussion demonstrates that *Cohn* 's reasoning is not persuasive in this case. *Cohn* was dictated by *Oksanen* 's holding that the hospital and its staff members on peer review committees are functionally one entity. In other words, if the hospital and the individual doctors are a single legal entity, it readily follows that the doctors are agents who should share the hospital's state action immunity. By contrast, in *Bolt III* we held that a hospital and its staff members on peer review committees are not functionally one entity to which *Copperweld* 's intraenterprise immunity doctrine applies. Accordingly, in *Todorov* we rejected the district court's rationale of treating the individual doctors as the same legal entity as the hospital. *See Todorov,* 921 F.2d at

---

[18]In the alternative, the district court held that the radiologists were protected by the *Noerr-Pennington* doctrine. *Id.* Opting to base our decision on other grounds, we declined to affirm on these grounds. *Id.* at 1446 n. 14.

1446 n. 13 ("Accordingly, the district court could not properly base its summary judgment *on the ground that the radiologists and DCH were a single legal entity.*") (emphasis added).

However, the rationale of *Bolt III* and *Todorov* does not govern the different issue in this case. Even though the Authority and its individual doctors are not per se the same legal entity, we must nevertheless inquire whether the particular actions of the individual doctors which are challenged in this case were actions taken by the doctors in performing official duties as agents of the hospital such that they should share the hospital's state action immunity. In other words, the fact that a hospital and its staff are separate economic or legal entities does not mean that a staff physician cannot be the agent of a hospital for certain purposes and in certain circumstances (e.g., certain administrative functions like peer review activities). In short, a hospital and its staff can be separate entities for purposes of intraenterprise immunity, but the staff physicians may in certain contexts be agents of the hospital for purposes of state action immunity. The policies underlying these two immunity doctrines are different, as are the factors which guide our analysis.[19]

To determine whether the individual doctors here were agents

---

[19]In the text we explain how *Todorov* is distinguished from this case because it merely rejected the same-legal-entity rationale. *Todorov* is also distinguishable on its facts. In *Todorov,* the challenged actions of the individual doctors were not actions in the performance of official duties as peer review committee members; rather, the individual doctors merely gave negative recommendations about plaintiff to the relevant peer review committees. By contrast, the challenged actions of the individual doctors in the instant case were all taken within the scope of their official duties as members of the hospital's peer review committees. *See infra* note 20.

of the Authority during the performance of the challenged actions, we look to the policies underlying the state action immunity doctrine and the context of the particular activities of the doctors in this case. The core policy underlying *Parker* immunity is that actions by the State, as sovereign, lie beyond the intended scope of the antitrust laws. *See Parker,* 317 U.S. at 352, 63 S.Ct. at 314 ("The state ..., as sovereign, imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit.") (citation omitted); *Town of Hallie,* 471 U.S. at 38, 105 S.Ct. at 1716 ("In *Parker,* ... the Court refused to construe the Sherman Act as applying to the anticompetitive conduct of a State acting through its legislature.... Rather, it ruled that the Sherman Act was intended to prohibit *private* restraints on trade....") (quotation omitted); *Patrick v. Burget,* 486 U.S. 94, 99, 108 S.Ct. 1658, 1662, 100 L.Ed.2d 83 (1988) ("The Sherman Act ... was not intended "to restrain state action or official action directed by the state.' ") (quotation omitted). What is critical is that the action be truly that of the State and not that of an individual or private actor. The "clear articulation" and "active state supervision" tests reflect this core policy. These tests are designed to ensure that the action taken was truly *state* action inasmuch as they require different levels of state involvement in the challenged action depending on whether the actor is a municipality or a private party. *See, e.g., Patrick,* 486 U.S. at 100, 108 S.Ct. at 1662 ("We ... established a rigorous two-pronged test to determine whether anticompetitive conduct engaged in by private parties should be deemed state action and thus shielded

from the antitrust laws.").

The actions of the individual doctor-defendants which are challenged in this case consisted exclusively of official actions taken as members of the hospital's peer review committees.[20] Accordingly, the issue in this case is whether the doctors' activities on SGMC peer review committees should be considered action taken by the Authority (i.e., by the political subdivision) or action taken by the individual doctors (i.e., by private parties). To determine whether the challenged actions were those of the Authority qua political subdivision, we are guided by *Town of Hallie, supra.* There, the Supreme Court distinguished between actions by political subdivisions, which are presumptively intended to further governmental interests if undertaken pursuant to clearly articulated state policy, and actions by private parties, which are presumptively intended to further private interests. *See Town of Hallie,* 471 U.S. at 47, 105 S.Ct. at 1720. The appropriate inquiry focuses on whether "there is little or no danger that [the actor] is involved in a *private* price-fixing arrangement," *id.,* as opposed to state action vindicating a truly governmental interest. As was true with respect to the Authority, we examine whether the nexus between the State and the actions of the doctors on peer review committees is sufficiently strong that there is little real danger that these doctors are involved in a *private* price-fixing arrangement.

---

[20]The district court found that each individual doctor defendant acted within the scope of his or her duty as a member of the various credentialing committees. *Crosby,* 873 F.Supp. at 1571. This finding is not clearly erroneous.

Because of the control exercised by the Authority over peer review decisions and the statutory context of peer review in Georgia, we conclude that the actions of individual doctors on peer review committees should be considered actions of the Authority such that the "active state supervision" requirement is unnecessary to ensure that the challenged actions are truly those of the State. First, the control exercised by the Authority over all staff credentialing decisions is strong evidence that it is the Authority and not its staff members acting. Under the Bylaws, the Authority retains power over decisions to grant or deny hospital privileges. Although the numerous layers of staff committees recommend the grant or denial of staff privileges to the Authority, the Authority is the repository of ultimate decisionmaking power and exercises plenary review of all credentialing decisions. *Cf. Ramey v. Hospital Auth. of Habersham County,* 218 Ga.App. 618, 462 S.E.2d 787, 788 (1995) ("[U]nder the law of this state the hospital authority, and not the medical staff, is responsible for selecting staff members."). Under the Bylaws, the Authority does not merely "rubber stamp" the committee recommendations; instead, it conducts an independent, meaningful review. It retains the power to follow, modify, or even disregard the recommendations of staff committees. In this case, it rendered its decision only after a full hearing at which Dr. Crosby was represented by counsel.[21]

---

[21]At this hearing before the Authority, Crosby was free to present evidence and argument that the several recommendations of the hospital's peer review committees were influenced by improper and irrelevant anticompetitive motives. We must assume that the Authority would have favorably entertained such arguments and evidence had they been persuasive; we must neither deconstruct the Authority's mental processes nor probe its intent. *City of*

Second, our conclusion derives strong support from the statutory context of peer review in Georgia. Under O.C.G.A. § 31-7-15, hospitals are required to provide for the review of professional practices in the hospital.[22] Specifically, hospitals are directed to evaluate the qualifications and professional competence of persons seeking to perform medical and health care services at the hospital. § 31-7-15(a)(3). Indeed, hospitals must undertake such evaluations to be entitled to a permit. § 31-7-15(c). The statute permits peer review committees to perform such

_Columbia,_ 499 U.S. at 377, 111 S.Ct. at 1352.

[22]O.C.G.A. § 31-7-15, provides, in relevant part:

> (a) A hospital ... shall provide for the review of professional practices in the hospital ... for the purpose of reducing morbidity and mortality and for the improvement of the care of patients in the hospital.... This review shall include, but shall not be limited to, the following: ...
>
> > (3) The evaluation of medical and health care services or the qualifications and professional competence of persons performing or seeking to perform such services.
>
> (b) The functions required by subsection (a) of this Code section may be performed by a "peer review committee," defined as a committee of physicians appointed by a state or local or specialty medical society or appointed by the governing board or medical staff of a licensed hospital or ambulatory surgical center or any other organization formed pursuant to state or federal law and engaged by the hospital ... for the purposes of performing such functions required by subsection (a) of this Code section.
>
> (c) Compliance with the above provisions of subsection (a) of this Code section shall constitute a requirement for granting or renewing the permit of a hospital....
>
> (e) Nothing in this or any other Code section shall be deemed to require any hospital or ambulatory surgical center to grant medical staff membership or privileges to any licensed practitioner of the healing arts.

evaluations. § 31-7-15(b). These committees may be appointed by, *inter alia,* the governing board or medical staff of a licensed hospital. *Id.* This statutory scheme reflects the reality of management at the Authority (and other hospitals). Physicians at hospitals often work in a variety of capacities. Primarily, they are "separate economic entities," i.e., independent contractors, as noted by the court in *Bolt III.* At times, they also function as part of the hospital's management structure.[23] In particular, they are called on to aid in staff credentialing decisions because they are in the best position to measure the quality of a physician's work and credentials, a proposition recognized by § 31-7-15.

For these reasons, we are satisfied that there is little or no danger of a private price fixing arrangement in this case such that the imposition of "active state supervision" is required. The Authority is a political subdivision of Georgia. As explicitly authorized by statute, it receives recommendations as to staff privilege decisions from peer review committees. It has not delegated absolute control to these committees;[24] instead, the Authority alone exercises ultimate control over all credentialing decisions. The only actions in this case were those of the Authority, a political subdivision of Georgia. Were we to rule

---

[23]*See, e.g.,* William S. Brewbaker, "Antitrust Conspiracy Doctrine and Hospital Enterprise," 74 B.U.L.Rev. 67 (1994).

[24]In this case, we need not and do not address the issue of whether *Midcal* 's active state supervision requirement would apply to the activities of peer review committee members if the peer review committees exercised unbridled discretion in making staff privilege decisions—i.e., if the Authority had completely delegated this function to the peer review committees of the medical staff.

otherwise, the state action immunity afforded the Authority would be meaningless because as a practical matter the Authority must act through its agents. In this case, we hold that the individual peer review committee members are immune from federal antitrust liability to the extent the Authority is immune.[25]

C. *Clear Articulation*

In this circuit, we have established a three-part inquiry to determine whether an entity satisfies the single-prong ("clear articulation") test set forth in *Town of Hallie, supra.* The entity must show: "(1) that it is a political subdivision of the state; (2) that, through statutes, the state generally authorizes the political subdivision to perform the challenged action; and (3) that, through statutes, the state has clearly articulated a state policy authorizing anticompetitive conduct." *FTC v. Hospital Board*

---

[25]Dr. Crosby rejoins that the reasons proffered by the various peer review committees were a mere pretext for their true anticompetitive motives. As *City of Columbia* directs, however, once it is determined that the denial of Crosby's application for staff privileges was "state action," the individual motives underlying that action become irrelevant. *City of Columbia,* 499 U.S. at 377-78, 111 S.Ct. at 1352 (" "[W]here the action complained of ... was that of the State itself, the action is exempt from antitrust liability regardless of the State's motives in taking the action.' ") (quotation omitted). "*[A]ny* action that qualifies as state action is "*ipso facto* ... exempt from the operation of the antitrust laws'...." *Id.,* 499 U.S. at 379, at 1353 (quoting *Hoover v. Ronwin,* 466 U.S. 558, 568, 104 S.Ct. 1989, 1995, 80 L.Ed.2d 590 (1984)). Because the individual staff members were acting as agents of the Authority in making their peer review recommendations, they were acting at the behest of and as an arm of the State and, therefore, their motives are irrelevant so long as the challenged actions were undertaken pursuant to clearly articulated state policy. Crosby had an opportunity at the hearing before the Authority to demonstrate that the peer review committee members made their recommendations for improper and irrelevant anticompetitive reasons. We cannot probe the Authority's intent in rejecting any such arguments by Crosby.

*of Directors of Lee County,* 38 F.3d 1184, 1187-88 (11th Cir.1994). Because we have determined that defendants are a political subdivision of the State and the parties concede that Georgia generally authorizes them to perform the challenged action,[26] we proceed to the third part.

The third requirement under the *Lee County* test is that the State must, through its statutes, clearly articulate a policy authorizing the challenged anticompetitive conduct. *Id.* at 1187-88. The Supreme Court has noted that the phrase "clearly expressed" does not require the legislature to state explicitly that it anticipates anticompetitive effects. *Town of Hallie,* 471 U.S. at 42, 105 S.Ct. at 1718; *see also Southern Motor Carriers Rate Conf. v. United States,* 471 U.S. 48, 64-65, 105 S.Ct. 1721, 1731, 85 L.Ed.2d 36 (1985) ("[I]f the State's intent to establish an anticompetitive regulatory program is clear ..., the State's failure to describe the implementation of its policy in detail will not subject the program to the restraints of federal antitrust laws."). "Rather, it simply requires that the anticompetitive conduct be a foreseeable result of the powers granted to the political subdivision." *Lee County,* 38 F.3d at 1189 (citing *Town of Hallie, supra* ). This circuit requires "only that the anticompetitive conduct be reasonably anticipated, rather than the inevitable, ordinary, or routine outcome of a statute." *Id.* at

---

[26]The district court stated that whether Georgia has authorized the challenged conduct was not at issue. 873 F.Supp. at 1578 n. 10. Crosby has not argued otherwise and, accordingly, we do not specifically address this issue. We note, however, that in examining whether Georgia, through its statutes, has clearly articulated a state policy in favor of the alleged anticompetitive conduct, we necessarily touch on this issue.

1190-91.

Accordingly, we must determine whether the alleged anticompetitive conduct is a reasonably foreseeable result of the statutes authorizing the Authority to grant or deny staff privilege applications. To do so, we must identify precisely the alleged anticompetitive conduct. Dr. Crosby alleges that the Authority denied his application for staff privileges at SGMC because its doctors determined there to be a sufficient number of orthopedic surgeons with such privileges. As he sees it, the hospital sought to suppress competition at SGMC so as to maintain each doctor's current level of business and income and to inflate prices.[27]

In this case, the Authority's power to grant or deny staff privileges derives from O.C.G.A. § 31-7-7, which provides in relevant part:

> (a) Whenever any licensed *doctor of medicine, doctor of podiatric medicine, doctor of osteopathic medicine, or doctor of dentistry* shall make application for permission to treat patients in any hospital owned or operated by the state, any political subdivision thereof, or any municipality, the hospital shall act in a nondiscriminatory manner upon such application expeditiously and without unnecessary delay considering the applicant on the basis of the applicant's demonstrated training, experience, competence, *and availability and reasonable objectives, including, but not limited to, the appropriate utilization of hospital facilities*....
>
> (b) Whenever any hospital owned or operated by the state, any political subdivision thereof, or any municipality shall refuse to grant *a licensed doctor of medicine, doctor of podiatric medicine, doctor of osteopathic medicine, or doctor of dentistry* the privilege of treating patients in the hospital, wholly or in part, or revoke the privilege of such licensed medical practitioner for treating patients in such

---

[27]Dr. Crosby also alleges that the Authority denied his application because he is an osteopathic physician. To the extent this claim fits into the antitrust model, it is subsumed in the argument set forth in the text.

hospital, wholly or in part, the hospital shall furnish to the licensed medical practitioner whose privilege has been refused or revoked, within ten days of such action, a written statement of the reasons therefor....

(emphasis added).

The emphasized language reflects relevant amendments incorporated into the statute in 1990. The parties generally base their arguments on the previous version of the statute which, *inter alia,* omitted the language in subsection (a) which authorizes the Authority to consider applications based on the "appropriate utilization of hospital facilities." Appellant assumes that, because the events in this case took place in 1986 and 1987, the prior version of the statute applies.

The district court applied the new version of the statute without discussion of the prior version. *Crosby,* 873 F.Supp. at 1579. It concluded that "[t]he Georgia legislature could have foreseen, or at least reasonably anticipated, that authorities would consider the number of market participants in determining the "appropriate utilization of hospital facilities.' " *Id.*

The district court was correct to apply the new version of the statute. As discussed *infra,*[28] Dr. Crosby's action for damages against all defendants is barred by the Local Government Antitrust Act. Consequently, he is limited to injunctive relief. Because injunctive relief is prospective, a party seeking an injunction must show a threat of future injury. "Logically, "a prospective remedy will provide no relief for an injury that is, and likely will remain, entirely in the past.' " *Church v. City of*

---

[28]*See infra* Section II.D.

*Huntsville,* 30 F.3d 1332, 1337 (11th Cir.1994) (quoting *American Postal Workers Union v. Frank,* 968 F.2d 1373, 1376 (1st Cir.1992)). This concept has been described as one of mootness.

> At every stage in the proceedings the court must "stop, look, and listen' to determine the impact of changes in the law on the case before it. *Kremens v. Bartley,* 431 U.S. 119, 135, 97 S.Ct. 1709, 1718, 52 L.Ed.2d 184 (1977) (impact of changes in challenged statute on composition of certified class of plaintiffs). Where a law is amended so as to remove its challenged features, the claim for injunctive relief becomes moot as to those features. [Cits].

*Naturist Soc., Inc. v. Fillyaw,* 958 F.2d 1515, 1519-21 (11th Cir.1992). "Thus, a superseding statute or regulation moots a case only to the extent that it removes challenged features of the prior law." *Id.*

In this case, by way of injunctive relief, Crosby does not seek reinstatement, but rather, an order directing the Authority to review his application anew.[29] Assuming, *arguendo,* we undertook a review of the old (1984) version of O.C.G.A. § 31-7-7 and concluded that the Authority did not act pursuant to a clearly articulated state policy, any order we issued would not solve Dr. Crosby's problem. If we ordered that the Authority review Dr. Crosby's application again, such review would take place under the new (1990) version of O.C.G.A. § 31-7-7. Accordingly, the issue of whether the old version of the statute clearly articulates the

---

[29]In his brief, Dr. Crosby states:

> Appellant, Dr. Crosby, has not and does not seek an order directing that the Authority grant him staff privileges. He seeks to have injunctive relief to ensure that he is placed on a level playing field with his allopathic competitors. He also seeks monetary damages for the conduct of the private defendant physicians who participated in the denial of his staff privileges.

requisite policy is moot.  We must review the current statute as amended to determine whether Georgia has clearly articulated the challenged anticompetitive conduct.  In short, because injunctive relief is prospective, Dr. Crosby's claim travels under the new version of the statute.  *See Landgraf v. USI Film Products,* 511 U.S. 244, ----, 114 S.Ct. 1483, 1501, 128 L.Ed.2d 229 (1994) ("[R]elief by injunction operates *in futuro*....").

The clear articulation question is not a close one. Hospitals may make staff privilege decisions based on any reasonable objective, "including, but not limited to, the appropriate utilization of hospital facilities."  O.C.G.A. § 31-7-7.  We agree with the district court that it "is at the very least foreseeable, and most certainly reasonably anticipated, that this language would enable a hospital authority to engage in anticompetitive conduct through its peer review activities." *Crosby,* 873 F.Supp. at 1579.  This is not the type of case in which we must discern what type of conduct is reasonably anticipated from a broad authorization to act.  Rather, the statute explicitly provides for precisely the anticompetitive conduct about which Dr. Crosby complains.  At worst, Dr. Crosby alleges that the SGMC orthopedic surgeons determined that their services were sufficient to meet the demand for their specialty at the hospital and, therefore, agreed to deny Dr. Crosby hospital privileges.  This is exactly what the statute directs SGMC and the Authority to do.  We readily conclude that O.C.G.A. § 31-7-7 evidences a state policy in favor of the anticompetitive conduct challenged in this case and hold that all defendants are shielded from suit for injunctive

relief by state action immunity.[30]

The foregoing result is more readily reached than the similar results in *Bolt IV,* 980 F.2d at 1386 (reinstating, in part, the rationale of *Bolt III,* 891 F.2d at 825 ("[O]ne could correctly say that when Florida's legislature authorized peer review in licensed medical facilities, ... it could foresee that [the hospital] would rely on recommendations made by a physician's peers and refuse to deal with (i.e., boycott) that physician."));  and *Lee County,* 38 F.3d at 1192 (holding that when the state legislature expanded the hospital board's powers to acquire other hospitals, it was foreseeable that new acquisitions would result and that this would increase the board's market share in an anticompetitive manner). These cases illustrate that "reasonable anticipation" does not require explicit authorization to engage in anticompetitive conduct.

Our conclusion is not altered by Dr. Crosby's argument that Georgia's Constitution establishes a policy against restraints on trade.  Article III, § 6, ¶ 5 of the Georgia Constitution of 1983 provides that

> the General Assembly shall not have the power to authorize any contract or agreement which may have the effect of defeating or lessening competition, or encouraging a monopoly, which are hereby declared to be unlawful and void.

We will not undertake an examination of whether the legislature's

---

[30]Our conclusion that Georgia has reasonably anticipated the anticompetitive effects of hospital peer review decisions also derives strong support from O.C.G.A. § 31-7-15, the statute authorizing peer review.  *See supra* note 22.  This statute indicates the legislature's recognition that staff credentialing decisions will be aided by the use of peer review committees. *Accord Bolt IV,* 980 F.2d at 1386.

clear articulation of anticompetitive policy in O.C.G.A. § 31-7-7 violates this constitutional provision; we do not sit to determine whether a state statute violates state law for purposes of state action immunity. It is sufficient that Georgia has generally authorized the challenged anticompetitive conduct. *Cf. City of Columbia v. Omni Outdoor Advertising,* 499 U.S. 365, 371-72, 111 S.Ct. 1344, 1350, 113 L.Ed.2d 382 (1991) ("[I]n order to prevent *Parker* from undermining the very interests of federalism it is designed to protect, it is necessary to adopt a concept of authority broader than what is applied to determine the legality of the municipality's action under state law."). Insofar as Crosby argues that the constitutional provision simply clarifies state policy[31] (i.e., not that it renders the statute unconstitutional), we find that such policy has been tempered by a "rule of reason." *See Ferrero v. Assoc. Materials, Inc.,* 923 F.2d 1441, 1447 (11th Cir.1991). "The rule of reason protects those contracts which are reasonable in light of the interests of the parties and the interests of the public." *Id.* at 1447. As the district court found, the rule of reason protects contracts executed pursuant to O.C.G.A. § 31-7-7. The parties to SGMC's by-laws and the public have an interest in "the appropriate utilization of hospital facilities," i.e., maintaining a proper mix of doctors and specialties at the hospital so as to attract the optimal number of qualified professionals. O.C.G.A. § 31-7-7 is a reasonable

---

[31]*Cf. Atlanta Center Ltd. v. Hilton Hotels Corp.,* 848 F.2d 146, 148 (11th Cir.1988) ("The state of Georgia has expressed, both in its constitution and in its statutory law, a strong public policy disfavoring contractual restraints on competition and trade.").

response to such interest because it allows hospitals to make their staff credentialing decisions based on such criteria. *See Crosby*, 873 F.Supp. at 1579-81.

In sum, the statutory language here easily surpasses the "clear articulation" mark. Further, given the mitigating influence of the rule of reason, it is at the very least reasonably foreseeable that O.C.G.A. § 31-7-7 would lead hospital decisionmakers to act anticompetitively in determining the "appropriate utilization of facilities" notwithstanding Article III, § 6, ¶ 5 of the Georgia Constitution. Accordingly, we readily conclude that all defendants are shielded from suit for injunctive relief by state action immunity.[32]

D. *Local Government Antitrust Act*

The district court held that the Local Government Antitrust Act of 1984 ("LGAA"), 15 U.S.C.A. § 34 et seq., precludes Dr. Crosby's action for damages against all defendants. *Crosby,* 873 F.Supp. at 1581. Dr. Crosby does not contest this conclusion as to the Authority or its board members. He argues, however, that the individual committee members are not immunized by the LGAA.

---

[32]Dr. Crosby urges that a different conclusion is mandated by *FTC v. Ticor Title Ins. Co.,* 504 U.S. 621, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992). His argument focuses on *Ticor* 's insistence on real compliance with the active supervision requirement. *Id.,* 504 U.S. at 633-39, 112 S.Ct. at 2177-79. The foregoing discussion makes clear that this aspect of *Ticor* has no bearing on this case because we need not reach the "active supervision" requirement. As to the "clear articulation" requirement, the Court in dicta reiterated that "[i]n the usual case, *Midcal* 's requirement that the State articulate a clear policy shows little more than that the State has not acted through inadvertence...." *Id.,* 504 U.S. at 636, 112 S.Ct. at 2178. As the discussion *supra* makes clear, Georgia's statutory action reasonably portends the challenged anticompetitive conduct in this case.

The LGAA provides, in relevant part:

> No damages, interest on damages, costs or attorney's fees may be recovered under section 4, 4A, or 4C of the Clayton act (15 U.S.C. 15, 15a, or 15c) in any claim against a person based on any official action directed by a local government, or official or employee thereof acting in an official capacity.

15 U.S.C.A. § 36(a). Section 4 of the Clayton Act provides the damages remedy for violations of the Sherman Act; thus, it applies to Dr. Crosby's allegations. We must determine whether the actions of the individual committee members constitute "official action[s] directed by a local government, or official or employee thereof acting in an official capacity."[33]

As to the phrase "action directed by a local government," the Joint Report of the Conference Committee explains:

> In Referring in section 4 to the applications of the antitrust laws to the conduct of non-governmental parties *directed by a local government,* the conferees borrowed the phrase *"official action directed by"* a local government from *Parker v. Brown,* 317 U.S. 341, 351 [63 S.Ct. 307, 313, 87 L.Ed. 315] (1941); and the conferees intend that *Parker* and subsequent cases interpreting it shall apply by analogy to the conduct of a local government in directing the actions of non-governmental parties, as if the local government were a state.

H.R.Conf.Rep. No. 1158, 98th Cong., 2d Sess. 3, *reprinted in* 1984 U.S.Code Cong. & Admin. News 4602, 4626-27 (emphasis added). The analogy to the *Parker* doctrine is confirmed by comparing the language in the statute to that in *Parker.* *Parker* held that the federal antitrust laws were not intended "to restrain a state or its officers or agents from activities *directed by* its

---

[33]Dr. Crosby essentially concedes that the Authority falls within the definition of "local government" and that the individual committee members are "persons" within the meaning of the LGAA by failing to argue otherwise on appeal. *See Cheffer v. Reno,* 55 F.3d 1517, 1519 n. 1 (11th Cir.1995) (issues not argued in brief deemed abandoned); *see also* Fed.R.App.P. 28(a)(6).

legislature."   317 U.S. at 350-51, 63 S.Ct. at 313 (emphasis added);  *see also City of Lafayette, La. v. La. Power & Light Co.,* 435 U.S. 389, 409, 98 S.Ct. 1123, 1134, 55 L.Ed.2d 364 (1978).  It is clear that the language in the statute (i.e., "action directed by a local government") was based on the above-quoted language in *Parker.*

As discussed *supra,* the *Parker* doctrine has developed such that, where the defendant is a private actor (i.e., not a "municipality"), he or she must show both that:  1) the challenged restraint is one clearly articulated and affirmatively expressed as state policy;  and 2) the policy is actively supervised by the state.  *FTC v. Ticor Title Ins. Co.,* 504 U.S. 621, 633, 112 S.Ct. 2169, 2176, 119 L.Ed.2d 410 (1992);  *California Retail Liquor Dealers Ass'n. v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980).

Following the legislative intent embodied in the Joint Report of the Conference Committee, we apply by analogy the *Parker* doctrine to the relationship between the Authority (i.e., the entity under the LGAA which is analogous to the State in the state action immunity context) and the individual committee members (i.e., the entities under the LGAA which are analogous to private parties in the state action immunity context).[34]  *See Cohn v. Bond,* 953 F.2d 154, 157 (4th Cir.1991), *cert. denied,* 505 U.S. 1230, 112 S.Ct. 3057, 120 L.Ed.2d 922 (1992) ("Whether actions are directed by an official, as contemplated by the LGAA, is determined by borrowing and applying the State Action Doctrine two prong test.");

_____

[34]*See infra,* note 35.

*Sandcrest Outpatient Servs., P.A. v. Cumberland County Hospital System, Inc.,* 853 F.2d 1139, 1143 (4th Cir.1988) (Powell, Associate Justice (retired)) (undertaking similar analysis).

The challenged actions of the individual committee members in this case easily satisfy the two-prong *Midcal* test of clear articulation and active supervision. First, the individual committee members acted pursuant to clearly articulated policy of the Authority to deny privileges when the applicant had not completed the necessary residency. Specifically, the individual committee members acted pursuant to the Bylaws (adopted and approved by the Authority) in making recommendations to the Authority to deny Crosby's hospital privileges. Second, the Authority itself actively supervised the committees; as noted above, the Authority made the final decision to deny Crosby's privileges after a full hearing thereon. As noted *supra,* the language of the statute (contemplating immunity for the actions of a private person "based on any official action directed by a local government, or official or employee thereof acting in an official capacity"), the legislative history, and the case law (*Cohn, supra; Sandcrest, supra*) make it clear that the second prong of the *Midcal* test is satisfied when the local government, in this case the Authority, actively supervises the challenged conduct.

Thus, we readily conclude that the two-prong *Midcal* test is satisfied, and that the challenged actions of the individual committee members in this case fall comfortably within the phrase

"official action directed by a local government."[35]  We hold that the individual committee members are immune from damages under the LGAA.

## III. CONCLUSION

Accordingly, for the foregoing reasons, the judgment of the district court is

AFFIRMED.

---

[35]We recognize that our holding, *supra,* that the actions of the individual doctors should be considered actions of the Authority for purposes of state action immunity may mean the individual doctors are directly immune under the LGAA, 15 U.S.C.A. § 35(a).  Section 35(a) provides that no damages may be recovered from a local government, or an official or employee thereof acting in an official capacity.  However, we also recognize that the specificity of the LGAA's language in § 35(a) ("local government, or official or employee") might suggest that agents other than "officials" or "employees" are not directly immune.  In any event, we need not decide whether the individual committee members should be deemed the equivalent of the local government, or an official or employee of the local government for purposes of the LGAA because the two-prong *Midcal* test is so readily satisfied, and the doctors are clearly immune under § 36(a).