658 So.2d 77 (1995)
In re ADVISORY OPINION TO THE GOVERNOR  STATE REVENUE CAP.
No. 85949.
Supreme Court of Florida.
July 7, 1995.
W. Dexter Douglass, Gen. Counsel, Office of the Governor, Tallahassee, for petitioner, the Honorable Lawton Chiles, Governor.
Michael Colodny and Maria Elena Abate of Colodny, Fass & Talenfeld, P.A., Fort Lauderdale; and Albert A. del Castillo of Squire, Sanders & Dempsey, Miami, on behalf of Florida Residential Property and Cas. Joint Underwriting Ass'n; Barbara B. Slott of Mahoney, Adams & Criser, P.A., Jacksonville, on behalf of Florida Windstorm Underwriting Ass'n; Elise M. Matthes, Tallahassee, on behalf of Ins. Consumer Advocate; and Daniel Y. Sumner, Dennis Silverman, Kelly Anne Cruz and Michael Davidson, Tallahassee, on behalf of Treasurer and Ins. Com'r, Bill Nelson, interested parties.
 The Honorable Lawton Chiles
 Governor of the State of Florida
 The Capitol
 Tallahassee, Florida XXXXX-XXXX
Dear Governor Chiles:
We acknowledge receipt of your communication of June 26, 1995, requesting our opinion concerning your executive powers and responsibilities for state planning and budgeting pursuant to article IV, section 1(a) of the Florida Constitution. We have jurisdiction to respond to this question under article IV, section 1(c) of the Florida Constitution. *78 Upon receipt of your letter, we issued an order permitting interested parties to file briefs in order to be heard on the question presented. Briefs were filed by the Florida Residential Property and Casualty Joint Underwriting Association, the Department of Insurance, and the Florida Windstorm Underwriting Association.
Omitting the formal parts, your letter reads as follows:
In November 1994, Florida voters approved a constitutional amendment limiting the growth of state revenues. The amendment is contained in Section 1(e), Article VII of the Florida Constitution. The new constitutional provision limits growth in state revenues in each fiscal year to the average annual growth rate in Florida personal income over the most recent twenty quarters times the permissible state revenues for the prior fiscal year. The revenue limit can be increased by a two-thirds vote of the membership of the Legislature, but if the limitation is exceeded, the excess must be placed in the Budget Stabilization Fund, until the fund attains the maximum amount and is then refunded to taxpayers.
The Constitution defines "state revenues" as taxes, fees, licenses, and charges for services imposed by the Legislature on individuals, businesses, or agencies outside state government. The revenue limitation will first apply in fiscal year 1995-96. The constitutional provision authorizes the Legislature to pass an implementing bill. At this time, no implementing bill has been passed.
Article IV, Section 1(a), of the Florida Constitution provides that the Governor shall be the chief administrative officer of the State responsible for the planning and budgeting for the State. Accordingly, I have a constitutional duty to take into consideration whether particular revenues fall under the revenue cap, and thus affect the planning and budgeting for the State. Moreover, as stated in In Re Advisory Opinion to the Governor, 509 So.2d 292 (Fla. 1987), among the general obligations of the chief executive under Article IV, Section 1(a) is the duty to ensure that the laws of the State are faithfully executed. As the Court stated: "A number of implicit fiscal responsibilities are inherently contained within this broad provision of authority."
In particular, the Florida Residential Property and Casualty Joint Underwriting Association is currently negotiating with financial institutions to obtain a $1.5 billion line of credit, and eventual long term bond financing, secured by funds available to the Association, including assessments, policy premiums and policy surcharges, pursuant to Section 627.351(6), Florida Statutes. In the course of these negotiations, a critical issue has arisen as to whether assessments, policy premiums and policy surcharges of the Florida Residential Property and Casualty Joint Underwriting Association are "state revenues" subject to the revenue cap in Article VII, Section 1(e), of the Florida Constitution. A determination whether the assessments, policy premiums and policy surcharges of the Florida Residential Property and Casualty Joint Underwriting Association fall within the revenue cap is necessary for me to carry out my constitutional duties with regard to planning and budgeting for the State in that if these funds are "state revenues" within the meaning of the revenue cap, and are being pledged as security for a $1.5 billion line of credit and eventual long term bond issue, then this factor must be taken into consideration in planning and budgeting analyses and calculations. Additionally, the question whether the assessments, policy premiums and policy surcharges of the Florida Residential Property and Casualty Joint Underwriting Association fall under the revenue cap impacts the fiscal stability of the State in that, in the absence of the proposed line of credit, over 740,000 policyholders of the Association will be in jeopardy of having their claims unpaid in the event of a catastrophic hurricane, wreaking havoc on the economy of the State.
There are several points which should be brought to the Court's attention with regard to this issue:

*79 1. Attorney General Butterworth issued an Opinion on June 9, 1995, relating to this issue. Attorney General Butterworth concluded Association assessments, policy premiums and policy surcharges are not "state revenues" for purposes of Article VII, Section 1(e).
2. Assessments, policy premiums and policy surcharges of the Association are not deposited or invested in the State Treasury, and are not subject to the provisions of Chapter 216, Florida Statutes.
3. Funds of the Association were not included in the legislative staff analysis or working papers used to support the Revenue Limitation in the legislative process.
For the reasons I have expressed herein and in the interest of the citizens of the State of Florida, I therefore, have the honor to request your written opinion as to: Are assessments, policy premiums and policy surcharges imposed by the Board of Governors of the Florida Residential Property and Casualty Joint Underwriting Association collected pursuant to 627.351(6), Florida Statutes, "state revenues" within the meaning of Article VII, Section 1(e) of the Florida Constitution?
Article VII, section 1(e), adopted by ballot initiative during the November 1994 general election, provides in pertinent part:
Except as provided herein, state revenues collected for any fiscal year shall be limited to state revenues allowed under this subsection for the prior fiscal year plus an adjustment for growth. As used in this subsection, "growth" means an amount equal to the average annual rate of growth in Florida personal income over the most recent twenty quarters times the state revenues allowed under this subsection for the prior fiscal year. For the 1995-1996 fiscal year, the state revenues allowed under this subsection for the prior fiscal year shall equal the state revenues collected for the 1994-1995 fiscal year... . State revenues collected for any fiscal year in excess of this limitation shall be transferred to the budget stabilization fund until the fund reaches the maximum balance specified in Section 19(g) of Article III, and thereafter shall be refunded to taxpayers as provided by general law... . For purposes of this subsection, "State revenues" means taxes, fees, licenses, and charges for services imposed by the legislature on individuals, businesses, or agencies outside state government. However, "state revenues" does not include: revenues that are necessary to meet the requirements set forth in documents authorizing the issuance of bonds by the state; revenues that are used to provide matching funds for the federal Medicaid program with the exception of the revenues used to support the Public Medical Assistance Trust Fund or its successor program and with the exception of state matching funds used to fund elective expansions made after July 1, 1994; proceeds from the state lottery returned as prizes; receipts of the Florida Hurricane Catastrophe Fund; balances carried forward from prior fiscal years; taxes, licenses, fees, and charges for services imposed by local, regional, or school district governing bodies; or revenue from taxes, licenses, fees, and charges for services required to be imposed by any amendment or revision to this constitution after July 1, 1994.
Section 627.351(6), Florida Statutes (1993), was adopted in the aftermath of Hurricane Andrew in order to provide property and casualty insurance to property owners who had been insured by insurance companies that became insolvent as a result of the losses incurred due to Hurricane Andrew. See ch. 92-345, § 1, Laws of Fla. Section 627.351(6) creates the Residential Property and Casualty Joint Underwriting Association (the Association) for the equitable apportionment and sharing among insurers of property and casualty insurance covering residential property for applicants who are in good faith entitled, but are unable, to obtain insurance through the voluntary market. § 627.351(6)(a), Fla. Stat. (Supp. 1994). All insurers authorized to write insurance in the state must participate in the Association and each member's responsibility for the losses and expenses incurred by the Association is calculated based upon a ratio between the direct premiums the member has written on *80 residential property in the preceding calendar year and the aggregate direct premiums that all of the members of the Association have written on residential property in the preceding calendar year. § 627.351(6)(b), Fla. Stat.
The assessments, premiums, and policy surcharges collected by the Association do not appear to fall within any of the enumerated exceptions set forth in article VII, section 1(e). The monies collected by the Association are not revenues related to bonds issued by the state, revenues for Medicaid, state lottery proceeds, receipts of the Florida Hurricane Trust Fund,[1] balances carried forward from prior fiscal years, or charges for services required to be imposed by constitutional amendment adopted after July 1, 1994. Therefore, we must determine whether the monies collected by the Association constitute "taxes, fees, licenses, and charges for services imposed by the Legislature on individuals, businesses, or agencies outside of state government." Art. VII, § 1(e).
Section 627.351(6)(j) expressly states that the Association is not a state agency, board, or commission. The Association operates subject to the supervision and approval of a board of directors consisting of members of the insurance industry, consumer representatives, and the insurance consumer advocate. § 627.351(6)(c)4., Fla. Stat. The board of directors sets insurance rates (subject to approval by the Department of Insurance), see section 627.351(6)(d), and determines the need for and the amount of the assessments that may be imposed upon the Association's members. § 627.351(6)(g)1., Fla. Stat. The acceptance or rejection of a risk by the Association's underwriting committee, which is charged with determining whether or not an individual is insurable, is construed as the private placement of insurance, and the provisions of chapter 120, Florida Statutes (1993), do not apply to these determinations. § 627.351(6)(c)8.b., Fla. Stat.
Your letter brings to our attention an opinion of the Attorney General which recently determined that revenues derived from the Association's assessments, premiums, and policy surcharges are not included within the term "state revenues." See Informal Opinion of the Attorney General of Florida to the Honorable Bill Nelson, June 9, 1995. The Attorney General's opinion explains that although it has previously held that joint underwriting associations such as the Florida Windstorm Underwriting Association, also created by chapter 627, Florida Statutes (1993), are subject to Florida's Public Records Law[2] and the Government in the Sunshine Law,[3] such a determination is not dispositive of the question of whether the Association is a public entity because chapter 119 and section 286.011 have historically been liberally construed to include private entities acting on behalf of a public entity. Id. at 3. The main thrust of the Attorney General's opinion is that the Legislature did not intend for the Association to be a state entity nor does the Association appear to be a state entity and therefore the funds collected by the Association should not be considered state revenues. We agree with the Attorney General's analysis that for the purposes of article VII, section 1(e), the Association is not a state entity.
Although created by state statute, the Association's function is to provide insurance to private individuals who might not otherwise be able to obtain insurance in the voluntary market. Article IV, section 4(e) of the Florida Constitution requires that the Treasurer keep all state funds. Yet, as noted in your letter, the assessments, policy premiums, and surcharges collected by the Association are not deposited or invested in the State Treasury *81 and are not subject to the planning and budgetary requirements of chapter 216, Florida Statutes. As you explained, the funds collected by the Association were not included in the legislative staff analysis and working papers that were used to support the legislative process that ultimately led to the placement of the revenue cap amendment on the 1994 general election ballot. You also point out that neither the Comptroller nor the Revenue Estimating Committee considers the revenue collected by the Association to be within the limitations of article VII, section 1(e). The Insurance Commissioner also shares this view.
This Court has previously determined that assessments collected by an insurance guaranty association are not state tax revenue or general funds and are not subject to the constitutional prohibitions on the treatment and usage of tax revenues and general funds. O'Malley v. Florida Ins. Guar. Ass'n, 257 So.2d 9 (Fla. 1971). In O'Malley, we held that funds collected by the Florida Insurance Guaranty Association to pay insurance claims made against insolvent insurers "[were] not in the class of state tax revenue or general funds and [did] not come within the ambit of the constitutional provisions that govern the deposit and disbursement of state tax or general revenue funds." Id. at 12. Similar to the Association, the Florida Insurance Guaranty Association was created to provide insurance coverage to private individuals who had obtained insurance coverage from insurers who subsequently became insolvent.
The fact that the assessments, premiums, and policy surcharges collected by the Association are treated in a significantly different fashion than the monies collected by the State through its agencies, boards, and commissions provides support for the conclusion that the monies collected by the Association are not "state revenues." Moreover, the premiums and assessments collected by the Association are not "imposed by the Legislature." In addition, there is no law which permits the State or any local government to provide funds to the Association. We acknowledge that section 627.351(6)(j) provides that for purposes of section 199.183(1), Florida Statutes (1993), the Association shall be considered a political subdivision of the State. However, this provision was included in order to exempt the Association from intangible taxes and does not reflect a legislative intent that the Association should be considered a political subdivision of the State for any other purpose.
Article VII was intended to curb the growth of government spending by limiting the amount of taxes and other revenues the State can collect each year. However, the Association is not performing a traditional governmental function. Its revenues are not subjected to legislative appropriation and are held solely for the purpose of satisfying insurance claims. Though created by the Legislature, in practical effect the Association operates like a private insurance company. It is evident that the monies collected by the Association are not the kind of revenues contemplated by article VII, section 1(e).
In conclusion, we answer your inquiry by finding that the assessments, premiums, and policy surcharges imposed by the Association's Board of Governors collected pursuant to section 627.351(6), Florida Statutes, are not "state revenues" within the meaning of article VII, section 1(e) of the Florida Constitution.
 Very truly yours,
 /s/ Stephen H. Grimes
 STEPHEN H. GRIMES
 Chief Justice
 /s/ Ben F. Overton
 BEN F. OVERTON
 Justice
 /s/ Leander J. Shaw, Jr.
 LEANDER J. SHAW, JR.
 Justice
 /s/ Gerald Kogan
 GERALD KOGAN
 Justice
 /s/ Major B. Harding
 MAJOR B. HARDING
 Justice
 /s/ Charles T. Wells
 CHARLES T. WELLS
 Justice
*82
 /s/ Harry Lee Anstead
 HARRY LEE ANSTEAD
 Justice
NOTES
[1] We note, however, that section 627.351(6)(k) states that in the event that the Association is dissolved, all assets remaining after payment of the Association's debts, liabilities and obligations shall become the property of the State and deposited in the Florida Hurricane Catastrophe Fund. The Attorney General's opinion points out that the Florida Hurricane Catastrophe Fund is a state trust fund under the direction and control of the State Board of Administration, thereby necessitating an express exemption from the definition of "state revenues" in order to avoid application of the revenue cap. Informal Opinion of the Attorney General of Florida to the Honorable Bill Nelson, June 6, 1995.
[2] Ch. 119, Fla. Stat. (1993).
[3] §§ 119.14, 286.011, Fla. Stat. (1993).