[ PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 97-2334

————————————————

D. C. Docket No. 96-785-CIV-T-25A

BANKERS INSURANCE CO.,

Plaintiff-Appellant,

versus

FLORIDA RESIDENTIAL PROPERTY AND CASUALTY
JOINT UNDERWRITING ASSOCIATION, JAMES W.
NEWMAN, JR., ET AL.,

Defendants-Appellees.

————————————————

Appeal from the United States District Court
for the Middle District of Florida

————————————————

**(March 26, 1998)**

Before COX and CARNES, Circuit Judges, and FAY, Senior Circuit Judge.

PER CURIAM:

Bankers Insurance Company sued the Florida Residential Property and Casualty Joint Underwriting Association (the Association) and several of its officers and counsel, alleging a conspiracy to restrain trade in violation of federal and Florida antitrust law. The district court granted the Association judgment on the pleadings. Bankers appeals, and we affirm.

## I. Background

Florida's legislature reacted to Florida's post-Hurricane Andrew insurance crisis by creating an involuntary association of all Florida residential-property insurers. *See* Fla. Stat. § 627.351(6)(a). This association, the Florida Residential Property and Casualty Joint Underwriting Association, is directed to write policies for citizens who are unable to obtain property and casualty insurance on the "voluntary" insurance market. *Id*. The insurers required to participate in the Association make up the Association's losses pro rata, according to each insurer's market share. *See id*. § 627.351(6)(b)(3).

The Association is authorized to contract for the servicing of policies it has written. *See* Fla. Stat. § 627.351(6)(c). Bankers, a Florida insurer, provided a substantial part of these services from the Association's inception in 1993. In 1995, the Association announced competitive bidding for servicing contracts. The Association ultimately accepted three of the ten bids; Bankers was one of the

2

disappointed bidders. Bankers alleges that the rejection of its bid was unjustifiable because the Association revised bid standards in mid-review and because the Association disregarded the preferences of the independent insurance agents who sell the Association's policies.

After Bankers' bid was refused, Bankers pursued its administrative remedies. When those failed, it sued the Association and the committee that controlled the bidding process for violations of the Sherman Antitrust Act and Florida Antitrust Act of 1980, Fla. Stat. § 542.15 *et seq.* Bankers makes no monopoly- or monopsony-related claims under § 2 of the Sherman Antitrust Act; it claims only that the Association and the four individual defendants conspired to restrain trade in violation of § 1 of that Act.

The district court granted the defendants judgment on the pleadings. It reasoned that the Association was protected by the *Parker* doctrine, *see Parker v. Brown*,[1] which excludes from the Sherman Act's scope anticompetitive conduct by a state as sovereign, or by state political subdivisions under certain circumstances. Alternatively, the district court ruled that the Association and its agents could not conspire to restrain trade as a matter of law under the doctrine of *Copperweld Corp.*

---

[1] 317 U.S. 341, 63 S. Ct. 307 (1943).

*v. Independence Tube Co.*[2] because they lack the requisite diversity of interests.

Bankers appeals. It contends that the district court erred in treating the Association as a political subdivision of the state and in viewing the Association as a single entity incapable of conspiring with itself.[3] We review the district court's grant of judgment on the pleadings de novo. *See Slagle v. ITT Hartford*, 102 F.3d 494, 497 (11th Cir. 1996).

## II. Discussion

Judgment on the pleadings is appropriate when material facts are not in dispute and judgment can be rendered by looking at the substance of the pleadings and any judicially noticed facts. *See id.*; *Herbert Abstract Co. v. Touchstone Properties, Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990). For these purposes, we accept the facts alleged in the complaint as true and draw all inferences that favor the nonmovant, here Bankers. *See Slagle*, 102 F.3d at 497.

### A. *Ability to Conspire*

---

[2]    467 U.S. 752, 104 S. Ct. 2731 (1984).

[3]    Bankers also asserts that the district court erred in not permitting Bankers to amend its complaint to add more conspirators. Bankers never sought to amend its complaint during the months between the motion for judgment on the pleadings and the district court's order, or at any time after that order. The district court did not abuse its discretion in not *sua sponte* inviting Bankers to amend.

4

Purely unilateral action does not violate § 1 of the Sherman Antitrust Act; therefore, agents and employees of a single entity cannot conspire to restrain trade, as a matter of law. *See Tiftarea Shopper, Inc. v. Georgia Shopper, Inc.*, 786 F.2d 1115, 1118 (11th Cir. 1986); *see also Copperweld*, 467 U.S. at 769, 104 S. Ct. at 2740-41. The district court thus correctly granted judgment in favor of the four individual defendants. The complaint alleges that the individual defendants are the executive director, counsel, and director of operations of the Association. As officers and counsel of the Association, they are its agents and submitted to its control in all matters relating to the Association. Their interests are, therefore, to that extent aligned, and the "plurality of persons" needed for a § 1 violation is missing. *See Copperweld*, 467 U.S. at 769, 104 S. Ct. at 2740-41. We need not address whether a different conclusion would be appropriate if the individual defendants also represented other interests, *cf. St. Joseph's Hosp., Inc. v. Hospital Corp. of Am.*, 795 F.2d 948, 956 (11th Cir. 1986), because the complaint contains no such allegations.

The question for the Association itself is more difficult. As Bankers argues, associations differ from corporations or other unitary entities enough that they may sometimes fall outside this intraenterprise conspiracy rule. *See Chicago Prof'l Sports, Ltd. v. National Basketball Ass'n*, 95 F.3d 593, 598-99 (7th Cir. 1996). We decline to

reach this issue, however, because in any event the Association is entitled to state action immunity, as discussed below.

## B. *State Action Immunity*

Out of federal deference to state sovereignty, states are immune from federal antitrust law for their actions as sovereign. *Parker v. Brown*, 317 U.S. 341, 351-53, 63 S. Ct. 307, 314 (1943). Three rules limit this immunity, according to the antitrust defendant's status. *See Crosby v. Hospital Auth.*, 93 F.3d 1515, 1521-22 (11th Cir. 1996), *cert. denied*, 117 S. Ct. 1246 (1997). First, state legislatures and courts are completely immune from antitrust liability. *Hoover v. Ronwin*, 466 U.S. 558, 569, 104 S. Ct. 1989, 1995 (1984). Second, political subdivisions such as municipalities are immune from antitrust liability if their anticompetitive acts follow a "clearly articulated and affirmatively expressed state policy." *See Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 44, 105 S. Ct. 1713, 1719 (1985) (quoting *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 415 S. Ct. 1123, 1138 (1978) (opinion of Brennan, J.)); *Crosby*, 93 F.3d at 1522-23. Third, private actors benefit from state immunity only if they act pursuant to a "clearly articulated and affirmatively expressed state policy" *and* the state actively supervises the anticompetitive conduct. *Southern Motor Carriers Rate Conference v. United States*, 471 U.S. 48, 57, 105 S. Ct. 1721, 1727 (1985); *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 104, 100 S. Ct. 937, 943 (1980). The central dispute in this case is into which category — political subdivision or private actor — the Association falls,

and thus whether the Association must show active state supervision to obtain *Parker* immunity.

No simply stated rule draws the line between the two categories. Cases before the Supreme Court have concerned only municipalities, the paradigm of a political subdivision. *See City of Columbia v. Omni Outdoor Advertising*, 499 U.S. 365, 111 S. Ct. 1344 (1991); *Town of Hallie*, 471 U.S. at 34, 105 S. Ct. at 1713. This circuit, however, has found hospital and transit authorities to be political subdivisions. *See, e.g., Crosby*, 93 F.3d at 1523-26; *FTC v. Hospital Bd. of Dirs.*, 38 F.3d 1184, 1188 (11th Cir. 1994); *Askew v. DCH Reg'l Health Care Auth.*, 995 F.2d 1033, 1038 (11th Cir. 1993); *Bolt v. Halifax Hosp. Med. Ctr.*, 980 F.2d 1381, 1386 (11th Cir. 1993); *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1460-62 (11th Cir. 1991); *Commuter Transp. Sys., Inc. v. Hillsborough County Aviation Auth.*, 801 F.2d 1286, 1290 (11th Cir. 1986). Other circuits have conferred political-subdivision status on a state bar organization, *Hass v. Oregon State Bar*, 883 F.2d 1453, 1461 (9th Cir. 1989), a transportation authority, *Interface Group v. Massachusetts Port Auth.*, 816 F.2d 9, 13 (1st Cir. 1987), and a rural electric cooperative, *Fuchs v. Rural Elec. Convenience Coop.*, 858 F.2d 1210, 1217 (7th Cir. 1988).

Each of these cases has focused on the government-like attributes of the defendant entity. Factors favoring political-subdivision treatment include open

records,[4] tax exemption,[5] exercise of governmental functions,[6] lack of possibility of private profit,[7] and the composition of the entity's decisionmaking structure. *See* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 212.7, at 208-10 (1997 Supp.). The presence or absence of attributes such as these tells us whether the nexus between the State and the entity is sufficiently strong that there is little real danger that the entity is involved in a *private* anticompetitive arrangement. *See Crosby*, 93 F.3d at 1524. The more public the entity looks, the less we worry that it represents purely private competitive interests, and the less need there is for active state supervision to ensure that the entity's anticompetitive actions are indeed state actions and not those of an alliance of interests that properly should be competing. *See Town of Hallie*, 471 U.S. at 45, 105 S. Ct. at 1217; *Fuchs*, 858 F.2d at 1214.

The Association is not short on public-entity trappings that suggest it is entitled to political-subdivision status.[8] The Association is subject to Florida's "sunshine

---

[4] *Commuter Transp. Sys., Inc.*, 801 F.2d at 1290; *Hass*, 883 F.2d at 1460; *see also id.* at 1466-67 (Ferguson, J., dissenting) (noting absence of mandatory disclosure obligations for state bar that majority found to be political subdivision).

[5] *See Crosby*, 93 F.3d at 1525; *Commuter Transp. Sys., Inc.*, 801 F.2d at 1290.

[6] *See Crosby*, 93 F.3d at 1525 (running a hospital); *Interface Group, Inc.*, 816 F.2d at 13 (issuing tax-exempt bonds, rulemaking).

[7] *See Fuchs*, 858 F.2d at 1217.

[8] Bankers argues that the Florida Supreme Court advisory opinion, *In re Advisory Opinion to the Governor — State Revenue Cap*, 658 So.2d 77 (1995), is dispositive of the issue whether the Association is a political subdivision. This argument overlooks the difference

laws." *See* Fla. Stat. § 627.351(6)(n).  It is exempt from corporate tax.  *See id*. § 627.351(6)(j).  It is authorized to issue tax-free bonds.  *See id.* § 627.351(6)(c)(3). Upon its dissolution, its assets become property of the state.  *See id.* § 627.351(6)(k). The Association operates under a detailed plan that must be approved by the Department of Insurance.  *See id.* § 627.351(6)(a), (c).  A board of governors supervises the Association's operations; the 13-member board includes five consumer representatives, the insurance consumer advocate, and two representatives of the insurance industry appointed by the state insurance commissioner.  Only five of the members are appointed by the insurance industry, and even those serve at the insurance commissioner's pleasure.  *See id*. § 627.351(c)(4).

On the other hand, the Association has one attribute that at first blush would seem to weigh on the private side of the public/private scale: it is at bottom an association of private, competing insurers.  Two facts, however, suggest that this attribute matters little here.  First, the Association was not created to compete in or regulate an existing market; rather, it invented a market where — by definition — none existed before.  *See* Fla. Stat. § 627.351(6)(a) (creating Association to serve "applicants who are in good faith entitled, but are unable, to procure insurance

_____

between the issue there (whether Association revenue falls within Florida's constitutional state revenue cap) and here (whether the Association is a political subdivision for antitrust purposes). *Cf. Crosby*, 93 F.3d at 1525 (refusing to view a Georgia Supreme Court opinion concerning sovereign immunity as dispositive of a hospital authority's state-related status).

through the voluntary market"). The members of the Association are not, therefore, competing in the market the Association serves. This impossibility of competition is an indicator that the Association represents public interests, rather than competing private interests. *Cf. Hass*, 883 F.2d at 1465-66 (Ferguson, J., dissenting) (contending that a state bar should not be considered a political subdivision because its members compete in the very market the bar regulates). Second, the Association is involuntary. *See id.* § 627.351(6)(b). Coerced private participation is yet another clue that the Association is an entity created by Florida's legislature to serve public interests and not a private, anticompetitive alliance formed with the state's blessing.

All things considered, the Association is entitled to be treated as a political subdivision for antitrust purposes. It thus merits state-action immunity if its allegedly anticompetitive actions were pursuant to a clearly articulated state policy. The Association's actions pass this test. Bankers' complaint appears to assert that the Association and its agents engaged in two kinds of improper conduct during the bid-review process: first, the Association in several respects altered its selection criteria during the bidding process; and second, the Association disregarded the preferences of independent agents who sell Association policies. These actions were for the purpose, Bankers alleges, of knocking Bankers out of the running and thereby reducing competition for servicing contracts.

11

A state anticompetitive action is pursuant to a clearly articulated policy when the action is *both* authorized by statute *and* its anticompetitive effect is an intended (meaning foreseeable) result of this authorization. *See Crosby*, 93 F.3d at 1532; *Lee County*, 38 F.3d at 1189. The first prong of this test is satisfied. Florida's legislature has granted the Association open-ended authority to plan to have its policies serviced by outside contractors:

> The plan of operation of the association [m]ay provide for one or more designated insurers, able and willing to provide policy and claims service, to act on behalf of the association to provide such service. Each licensed agent shall be entitled to indicate the order of preference regarding who will service the business placed by the agent. The association shall adhere to each agent's preferences unless after consideration of other factors in assigning agents, including, but not limited to, servicing capacity and fee arrangements, the association has reason to believe it is in the best interests of the association to make a different assignment.

Fla. Stat. § 627.351(6)(c)(1).

The second prong is also satisfied. The legislature's selection of the modal "may," rather than "shall," "will," or "must," shows that *all* of the first sentence of the section authorizing servicing contracts is permissive, not mandatory. The Association is therefore freely permitted to "provide for" policy service as it sees fit — or not to contract at all. It is foreseeable that conferring such unfettered discretion on the Association to select policy servicing services could result in potentially anticompetitive adjustment and revision of standards and selection criteria. *Cf. Hass*,

12

883 F.2d at 1458 (general authorization for state bar to require malpractice insurance, and to establish its own insurance fund, made it foreseeable that bar would require lawyers to purchase insurance from the bar); *Kern-Tulare Water Dist. v. City of Bakersfield*, 828 F.2d 514, 519-20 (9th Cir. 1987) (grant of authority to buy and sell water rights makes it foreseeable that a city would attach a no-resale-allowed condition to water sales). Furthermore, the legislature *explicitly* contemplates that the Association will do the other act Bankers complains of — disregarding independent agents' preferences — provided the Association believed it was in the Association's best interests to do so.

Because the Association is a political subdivision of the State of Florida and it acted pursuant to a clearly articulated legislative policy permitting it to select its contracting parties as it saw fit, the district court properly granted the Association judgment on the pleadings.

## III.  Conclusion

For the foregoing reasons, the district court's judgment is affirmed.

AFFIRMED.