BENNETT ELECTRIC COMPANY, a Florida corporation, and West Side Sanitation, Inc., d/b/a Lazaro's Waste & Recycling Systems, Inc., a Florida corporation, Plaintiffs,

v.

The VILLAGE OF MIAMI SHORES, a Florida municipality, Defendant.

No. 97–0727–CIV.

United States District Court,
S.D. Florida.

May 6, 1998.

Susan April, Holland & Knight, Howard Mazloff, Howard Mazloff, P.A., Miami, FL, for Plaintiffs.

Scott E. Perwin, Kenny Nachwalter Seymour Arnold Critchlow & Spector, P.A., Richard Sarafan, Richard & Richard, P.A., Miami, FL, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS AND ORDER CLOSING CASE

MORENO, District Judge.

This case presents the question of whether a municipality's decision to take control of the local waste collection market violates the Commerce Clause or the federal antitrust laws. The Court concludes that the municipality's actions neither discriminate against nor unduly burden interstate commerce, and that the municipality is entitled to state action immunity from the antitrust laws. Therefore, the municipality's motion to dismiss the Amended Complaint is GRANTED.

### I. BACKGROUND

Pursuant to the Miami Shores Village Code, commercial establishments and residential units must use the waste collection and disposal services of the Village of Miami Shores unless authorized to hire a private, village-licensed waste collector.[1] Plaintiffs' Amended Complaint[2] alleges that this municipal Ordinance violates the Commerce Clause, and the Sherman and Clayton Acts.

In their Amended Complaint, Plaintiffs claim that Miami Shores did not begin to enforce the portion of the Ordinance at issue until July 1995. At that time, numerous multi-family buildings and businesses contracted with private collectors for waste collection and disposal services, instead of using Miami Shores' services. On July 11, 1995, Miami Shores' Public Works Director recommended to the Miami Shores Manager that the entities that used private collectors be prohibited from doing so and be required to use and pay for Miami Shores' waste collection and disposal services.

On July 18, 1995, the Miami Shores Council began to enforce the Ordinance based in part on the recommendation of the Public Works Director and the Manager. The Council required all accounts, except for certain accounts which were exempted, to use and pay for Miami Shores' waste collection and disposal services. Plaintiffs allege that the Council began enforcing the Ordinance in order to fund capital improvements that are unrelated to waste collection.

As of the July 18, 1995, Council vote, Plaintiff Bennett Electric Company was utilizing Miami Shores' waste collection and disposal services. In September 1995, Bennett received a $3,170.50 statement from Miami Shores for anticipated waste collection and disposal services from October 1, 1995 to September 30, 1996.

Bennett subsequently sent a letter to Miami Shores terminating the municipal waste collection and disposal service. On October 1, 1995, Bennett entered into a one-year contract with a private collector—Environmental Waste Systems ("EWS")—for waste collection and disposal services. Bennett's contract with EWS was for $737.52, which Bennett notes is less than 25% of what Miami Shores would have charged for comparable services.

---

1. Miami Shores' Village Code § 9-2(a) (the "Ordinance") provides, in pertinent part, that "[e]very commercial establishment and residential unit shall utilize the waste collection services of the village, except as otherwise authorized in this chapter."

2. Plaintiffs filed their original Complaint, which had named individual members of the Miami

Shores Village Council as defendants, on March 21, 1997. Plaintiffs subsequently agreed to the voluntary dismissal of the individual defendants. On February 17, 1998, Plaintiffs filed an Amended Complaint, which named only the Village as a defendant, and which added a claim for declaratory relief under state law regarding the applicability of the Ordinance to source-separated recovered materials as defined by state law.

In early April 1996, Bennett received a notice from the Public Works Department indicating that the private collectors' licenses would not be renewed and that Bennett would be required to use Miami Shores' waste collection and disposal services. On April 26, 1996, Bennett's owner was informed by the Public Works Director that Bennett could no longer use the private collector, and that Bennett would have to use and pay for Miami Shores' waste collection and disposal services. Bennett was also informed by the Manager that Miami Shores would begin servicing Bennett on June 1, 1996.

In early May 1996, Bennett received a letter from the Public Works Director indicating that the charge for Miami Shores' waste collection and disposal services would be $3,589.35. Based on Miami Shores' actions, Bennett was unable to renew its contract with EWS after it expired on September 30, 1996, and Bennett was billed by both EWS and Miami Shores from June 1, 1996 through September 30, 1996.

Plaintiff West Side Sanitation, Inc., d/b/a Lazaro's Waste & Recycling Systems, Inc. ("Lazaro's") alleges that numerous contracts that it had with private commercial residents of Miami Shores to collect and dispose of their waste, as well as contracts that Lazaro's had purchased from another private collector, became valueless and were terminated as a result of Miami Shores' enforcement of the Ordinance.

## II. *LEGAL ANALYSIS*

### A. The Commerce Clause

The Commerce Clause provides that Congress "shall have Power ... To regulate Commerce with foreign Nations, and among the several States ...." U.S. Const. art. I, § 8, cl. 3. "Although the Commerce Clause is by its text an affirmative grant of power to Congress to regulate interstate and foreign commerce, the Clause has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce." *South–Central Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 87, 104 S.Ct. 2237, 81

L.Ed.2d 71 (1984). This negative restriction on state power is known as the "dormant" Commerce Clause. *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.,* 514 U.S. 175, 179, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995).

Under pertinent Supreme Court caselaw, this Court must conduct two inquiries to determine whether the Ordinance is valid despite its effect on interstate commerce.[3] First, the Court must determine "whether the ordinance discriminates against interstate commerce ...." *C & A Carbone, Inc. v. Town of Clarkstown,* 511 U.S. 383, 390, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). "Discrimination against interstate commerce in favor of local business or investment is *per se* invalid, save in a narrow class of cases in which the municipality can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *Id.* at 392, 114 S.Ct. 1677 (citing *Maine v. Taylor,* 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986)).

If, however, the Court finds that the Ordinance does not discriminate against interstate commerce, then the Court must proceed to the second inquiry: assessing "whether the ordinance imposes a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits.'" *Id.* at 390, 114 S.Ct. 1677 (quoting *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)).

### 1. Discrimination Against Interstate Commerce

The parties' arguments as to whether the Ordinance violates the Commerce Clause focus on two recent cases addressing similar Commerce Clause issues: *C & A Carbone, Inc. v. Town of Clarkstown,* 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), and *USA Recycling, Inc. v. Town of Babylon,* 66 F.3d 1272 (2d Cir.1995), *cert. denied,* 517 U.S. 1135, 116 S.Ct. 1419, 134 L.Ed.2d 544 (1996). *Carbone* involved a challenge by a solid waste processing company and related entities to a so-called flow control ordinance adopted by the Town of Clarkstown, New York. The flow

---

**3.** The parties do not dispute the fact that the Ordinance regulates interstate commerce, thus bringing the Ordinance "within the purview of

the Commerce Clause." *C & A Carbone, Inc. v. Town of Clarkstown,* 511 U.S. 383, 389, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994).

control ordinance basically provided that all nonhazardous solid waste within the town had to be processed at a designated transfer station before leaving Clarkstown. At this transfer station, bulk solid waste would be separated into recyclable and nonrecyclable items. The recyclable waste would then be shipped to a recycling facility, while the nonrecyclable waste would be sent to a landfill or incinerator. Carbone operated a recycling center in Clarkstown, performing many of the functions that the transfer station would perform. For example, Carbone would sort and bale bulk solid waste, and then ship it off to various processing facilities.

Under the flow control ordinance, the processing fees charged at the transfer station would be used to amortize the cost of the station. The local contractor who agreed to construct the facility was permitted to charge haulers a so-called tipping fee of $81 per ton, and the town guaranteed the contractor a minimum of 120,000 tons per year. If the station did not receive the minimum 120,000 tons, the town agreed to pay the deficit in the tipping fees. After five years under this arrangement, the town would purchase the facility from the contractor for one dollar.

The facility's ability to reach the 120,000 ton yearly guarantee was made more difficult by the fact that the $81 per ton tipping fee was greater than the disposal cost on the private market. To solve this problem and to help achieve the 120,000 ton guarantee, the town passed the flow control ordinance, thereby requiring all nonhazardous solid waste within Clarkstown to pass through the transfer station.

Under the flow control ordinance, Carbone was still allowed to receive solid waste, but Carbone had to bring the nonrecyclable items from that waste to the transfer station. Carbone thus could not ship the nonrecyclable waste itself, and Carbone had to pay the tipping fee on trash it had already sorted.

The Supreme Court held that the flow control ordinance violated the Commerce Clause. *Carbone*, 511 U.S. at 386, 114 S.Ct. 1677. The Court explained that "the flow control ordinance discriminates, for it allows only the favored operator to process waste that is within the limits of the town. The ordinance is no less discriminatory because

in-state or in-town processors are also covered by the prohibition." *Id.* at 391, 114 S.Ct. 1677. The Court further reasoned that the flow control ordinance "hoards solid waste, and the demand to get rid of it, for the benefit of the preferred processing facility." *Id.* at 392, 114 S.Ct. 1677. Similarly, the flow control ordinance was found to "squelch[ ] competition in the waste-processing service altogether, leaving no room for investment from outside." *Id.*

The Court rejected the Town of Clarkstown's argument that special financing was needed for the facility to survive: "If so, the town may subsidize the facility through general taxes or municipal bonds. But having elected to use the open market to earn revenues for its project, the town may not employ discriminatory regulation to give that project an advantage over rival business from out of State." *Id.* at 394, 114 S.Ct. 1677 (citation omitted).

In support of its argument that the Ordinance does not violate the Commerce Clause, Miami Shores attempts to distinguish *Carbone* and relies heavily on the Second Circuit Court of Appeals' decision in *USA Recycling, Inc. v. Town of Babylon*, 66 F.3d 1272 (2d Cir.1995), *cert. denied*, 517 U.S. 1135, 116 S.Ct. 1419, 134 L.Ed.2d 544 (1996). In *USA Recycling*, the Second Circuit analyzed, under the Commerce Clause, the Town of Babylon's decision to "take over the local commercial garbage market." *USA Recycling*, 66 F.3d at 1275. To establish control of the local market, the Town of Babylon hired two private companies: one to pick up commercial garbage, and the other to operate the incinerator to burn the garbage. To finance this system, Babylon relied on flat property taxes and user fees (based on the amount of garbage generated) paid by businesses and commercial property owners. The Second Circuit rejected the plaintiffs' arguments that Babylon's waste management plan discriminated against, or imposed an undue burden on, interstate commerce in violation of the Commerce Clause. *Id.* at 1276.

■ In its Motion to Dismiss, Miami Shores asserts that the Ordinance does not violate the Commerce Clause because, rather than selling waste collection services, Miami

Shores is providing these services as a municipal government performing traditional municipal functions that are not in conflict with federal law. Miami Shores argues that the instant case is more analogous to *USA Recycling* than to *Carbone,* and that the Ordinance thus does not violate the Commerce Clause. This Court agrees.

As in the Town of Babylon in *USA Recycling,* in Miami Shores "[n]o one enjoys a monopoly position selling garbage collection services in [the Village's] commercial garbage market, because the [Village] has eliminated the market entirely. Not even the [Village] itself remains as a seller in the market. Although the [Village] is now the lone provider of garbage collection services . . ., it does so as a local government providing services to those within its jurisdiction, not as a business selling to a captive consumer base." *USA Recycling,* 66 F.3d at 1283.

Here, as in *USA Recycling,* the municipality has taken over the waste collection services to the exclusion of private haulers. *Id.* at 1282. Thus, "Babylon's [and Miami Shores'] waste management plan[s] differ[ ] dramatically from the flow control ordinances struck down by the Supreme Court in *Carbone* and by [the Second Circuit in a related case]. In both of those cases, the challenged flow control ordinances required local garbage haulers to buy processing or disposal services from a local facility. In Babylon [and in Miami Shores], local businesses do not buy services from anyone. Instead, the Town unilaterally provides garbage service to everyone in the District." *Id.* at 1283. Unlike the situation in *Carbone,* in the instant case, the Village "is not selling anything, [and] it cannot be considered to be a favored single local proprietor as in *Carbone.*" *Id.* This Court concludes that if the Town of Babylon's decision to hire two private companies to control the local commercial garbage market satisfies the Commerce Clause, then Miami Shores' decision to take over the market itself, without favoring any private companies, certainly does not violate the Commerce Clause.

This Court also agrees with the *USA Recycling* court's rejection of the argument that *Carbone* "fashioned from the 'dormant' Commerce Clause a new, and unprecedentedly sweeping, limitation on local government authority to provide basic sanitation services to local residents and businesses, on an exclusive basis and financed by tax dollars."[4] *Id.* at 1276.

Plaintiffs argue that the Ordinance discriminates against interstate commerce because it hoards a local resource—waste—for the benefit of the favored local processor— Miami Shores. However, the *Carbone* Court merely found that the Clarkstown flow control ordinance constituted "just one more instance of local processing requirements that we long have held invalid." *Carbone,* 511 U.S. at 391, 114 S.Ct. 1677 (citations omitted). The Court explained that the flow control ordinance was similar to laws that had previously been found by the Court to "hoard a local resource—be it meat, shrimp, or milk—for the benefit of local businesses that treat it." *Id.* at 392, 114 S.Ct. 1677. The Court concluded that the flow control ordinance "hoards solid waste, and the demand to get rid of it, for the benefit of the preferred processing facility." *Id.*

The *Carbone* Court's concerns are not implicated where, as here, a municipality has completely eliminated the private market. In Miami Shores, no "local businesses" benefit from the Ordinance, and there is no "preferred processing facility." *Carbone* does not forbid a municipality from taking over waste collection itself. Miami Shores' decision to provide waste collection services using its own trucks and employees ensures that local and out-of-state businesses and investment are treated equally. Therefore, the Ordinance does not discriminate against interstate commerce. *See USA Recycling,* 66 F.3d at 1285 (finding that the "Town [of Babylon] has indeed excluded all garbage haulers . . . from selling garbage collecting services to businesses in Babylon. The Town's waste management system treats all

---

**4.** Plaintiffs note that the ordinance in *USA Recycling* involved generally applicable taxes, while Miami Shores charges user fees as a private waste processor would. However, the Town of Babylon also employed user fees for garbage

generated beyond a fixed base amount. *See USA Recycling,* 66 F.3d at 1276, 1279. In any event, even if Miami Shores relies solely on user fees rather than taxes, the Ordinance does not discriminate against interstate commerce.

garbage haulers alike and thus does not discriminate against interstate commerce.").

The distinction between a municipality taking over waste collection within its boundaries, as Miami Shores has done, and a municipality acting as a participant or regulator of a private market, was recognized by a district court in this Circuit, in a case relied on by Plaintiffs. *See Waste Recycling, Inc. v. Southeast Alabama Solid Waste Disposal Auth.*, 814 F.Supp. 1566 (M.D.Ala.1993), *aff'd without opinion*, 29 F.3d 641 (11th Cir.1994). The court in *Waste Recycling* held that municipal flow control ordinances enacted by three cities (as named representatives of 36 local governments) violated the Commerce Clause. The ordinances at issue required that all solid waste collected within each city by public or private collectors be delivered only to the waste disposal facility of the Southeast Alabama Solid Waste Authority, a public non-profit corporation organized by four counties, along with more than 30 cities and towns within the counties, to provide for solid waste management. However, the *Waste Recycling* court recognized the difficult questions raised by the issues currently before this Court:

> The defendants hypothetically question whether it would violate the commerce clause if a single municipality completely occupied the collection and disposal of solid waste within its boundaries—that is, the city collected and disposed of all solid waste at its own landfill, and prohibited any participation by private parties. Because this is not the scenario presented in this case, the court need not reach this difficult question. Here, the parties have defined the issues as whether the cities are participants in or regulators of *private* markets and, if the latter, whether their regulation of these *private* markets violates the commerce clause; the issue is not whether the cities have *nationalized* the markets within their boundaries.

*Waste Recycling*, 814 F.Supp. at 1583 n. 22 (emphasis added).

Plaintiffs assert several arguments to distinguish this case from *USA Recycling*. First, Plaintiffs argue that Miami Shores' actions are not "traditional municipal functions" and are illegal, while in *USA Recycling*, "New York law ma[de] clear that the

Town is fulfilling a governmental duty, not making a sale, when it provides garbage services." *USA Recycling*, 66 F.3d at 1283. Plaintiffs claim that a municipality cannot foreclose private competition in waste processing and charge inflated prices to raise revenues. Plaintiffs also posit that Florida's enactment of the Solid Waste Management Act, Fla. Stat. § 403.702 *et seq.* (the "SWMA"), indicates that waste collection is no longer a traditional municipal function in Florida. The Court rejects these contentions.

The Florida Statutes and Florida caselaw support Miami Shores' arguments that waste collection is indeed a traditional municipal function. *See* Fla. Stat. § 180.06(5) (1997) (authorizing municipalities to "provide for the collection and disposal of garbage"); *id.* § 180.13(2) (1997) (authorizing municipalities to "establish just and equitable rates or charges to be paid to the municipality for the use of [a] utility by each person, firm or corporation whose premises are served thereby"); *United Sanitation Servs. of Hillsborough, Inc. v. City of Tampa*, 302 So.2d 435, 436 (Fla. 2d DCA 1974) (although not addressing Commerce Clause issues, finding that "[u]nlike virtually every other enterprise, the 'business' [of garbage collection] may not only be regulated, but in fact exclusively performed—as an essential part of a 'public service'—by municipalities or other governmental subdivisions, even if such a decision results in the complete preclusion of private facilities for the same use"); *see also United Sanitation*, 302 So.2d at 436 (explaining that the "private business of [garbage] collection ... is not, nor has it ever been, akin in any way to 'ordinary' examples of private enterprise—the selling of shoes, the repair of automobiles, or the selling of motel rooms.... [T]he 'enterprise' of garbage collection is one of those unique callings which are subject to the plenary power of government."). Plaintiffs cite no authority to support the notion that Fla. Stat. § 180 has been repealed or that *United Sanitation* has been overruled by the SWMA.

The Court is also not convinced by Plaintiffs' argument that waste processing is a "proprietary," or quasi-private, function rath-

er than a "governmental" function based on *Smoak v. City of Tampa*, 123 Fla. 716, 167 So. 528 (1936). While noting that "there is certainly nothing connected with garbage disposal that partakes of a public or governmental function," the *Smoak* court merely found that a city could not claim sovereign immunity in tort when its employees negligently perform garbage collection duties. *Id.* 167 So. at 529. However, as Miami Shores notes, Florida courts no longer decide the sovereign immunity issue using the "proprietary/governmental" distinction, but rather employ an "operational/discretionary" distinction. *See Dep't of Health & Rehab. Servs. v. B.J.M.*, 656 So.2d 906, 911–912 (Fla. 1995).[5] In addition, a high-speed police chase can be an "operational" function that is not shielded from tort liability by sovereign immunity. *See City of Pinellas Park v. Brown*, 604 So.2d 1222, 1227 (Fla.1992). However, this surely does not indicate that police pursuit of criminals is not a governmental function.

The Court also notes that the SWMA contemplates that municipalities will play a significant role in providing waste collection services. *See, e.g.*, Fla. Stat. § 403.702(2)(i) (1997) (noting that one goal of the SWMA is to "[e]ncourage counties and municipalities to utilize all means reasonably available to promote efficient and proper methods of managing solid waste ..."); Fla. Stat. § 403.7049(3) (1997) (defining "service area" as "the area in which the county or municipality provides, directly or by contract, solid waste management services").

The *USA Recycling* court noted that "[f]or ninety years, it has been settled law that garbage collection and disposal is a core function of local government in the United States. At their option, cities may provide garbage pick-up to their citizens directly ... or they may rely on a closely regulated private market to provide those services." *USA Recycling*, 66 F.3d at 1275. The *USA Recycling* court relied in part on two long-

standing Supreme Court cases that, while not addressing Commerce Clause issues, are certainly relevant to the issues before this Court. In *California Reduction Co. v. Sanitary Reduction Works*, 199 U.S. 306, 26 S.Ct. 100, 50 L.Ed. 204 (1905) and *Gardner v. Michigan*, 199 U.S. 325, 26 S.Ct. 106, 50 L.Ed. 212 (1905), the Supreme Court rejected takings and due process challenges to San Francisco and Detroit ordinances that granted the exclusive garbage collection and disposal rights within the cities to single scavenger companies. The *USA Recycling* court found, and this Court agrees, that "[i]f we were to rule in plaintiffs' favor, the municipal garbage systems upheld by the Court in *California Reduction* and *Gardner* would be unconstitutional, and municipalities could no loner undertake the traditional local governmental function of collecting town garbage." *USA Recycling*, 66 F.3d at 1294. This Court would overstep its authority if it concluded that waste collection was no longer a traditional municipal function in Florida.

Plaintiffs also attempt to distinguish *USA Recycling* on several additional grounds. First, Plaintiffs assert that the Town of Babylon used competitive bidding for its waste contract, thereby giving out-of-state private competitors a chance to compete in the market, while Miami Shores has eliminated all private competition by taking over the waste collection itself. Plaintiffs also argue that in *USA Recycling*, the Town of Babylon was saving its residents money by consolidating services, while Miami Shores is charging its customers more than private competitors would in an effort to raise revenues. Plaintiffs further claim that *USA Recycling* is incompatible with *Carbone* and is simply wrong. The Court finds these arguments untenable.

Miami Shores' decision to use its own trucks and employees, rather than those of an independent contractor, obviated the need for competitive bidding. The *USA Recycling*

---

**5.** Certain "discretionary" governmental functions are immune from tort liability. "Discretionary" acts are those involving "an exercise of executive or legislative power such that, for the court to intervene by way of tort law would inappropriately entangle it in fundamental questions of policy and planning." *B.J.M.*, 656 So.2d

at 911 n. 3. "Operational" functions, which are subject to tort liability, are those which are "not necessary to or inherent in policy or planning, that merely reflect[ ] a secondary decision as to how those policies or plans will be implemented." *Id.* at n. 4.

court recognized the Town of Babylon's use of a competitive bidding process, which left open the possibility that an out-of-state firm could be selected to provide the waste collection services. *See USA Recycling*, 66 F.3d at 1287. Local and out-of-state firms were thus treated equally in Babylon, because either type of firm could theoretically be chosen to provide the waste collection duties. However, Miami Shores' decision to take over waste collection also results in equal treatment of local and nonlocal firms: all of them are precluded from collecting waste in the Village.

Plaintiffs also argue that Miami Shores' enforcement of the Ordinance stems from the Village's desire to raise revenue. *See* Amended Complaint ¶¶ 12, 31. After finding that the flow control ordinance discriminated against interstate commerce and "rigorous scrutiny" thus applied, the Court in *Carbone* noted that "[b]y itself, of course, revenue generation is not a local interest that can justify discrimination against interstate commerce." *Carbone*, 511 U.S. at 393, 114 S.Ct. at 1684. However, Miami Shores' Ordinance does not discriminate against interstate commerce, and thus "rigorous scrutiny" does not apply, as in-state and out-of-state waste collection firms are treated alike. Therefore, even accepting as true the allegation that the Ordinance has resulted in increased bills for Bennett based in part on the Town's desire to raise revenues, this Court is not compelled to find that the Ordinance discriminates against interstate commerce.

Plaintiffs' contention that *USA Recycling* is both "simply wrong" and irreconcilable with *Carbone* is without merit. While both cases present similar issues, the Second Circuit in *USA Recycling* thoroughly analyzed *Carbone* and found it distinguishable. This Court's conclusion that Miami Shores' Ordinance does not violate the Commerce Clause is consistent with both *Carbone*, which is binding authority, and with *USA Recycling*.

### 2. Undue Burden on Interstate Commerce

Having determined that the Ordinance does not discriminate against interstate commerce, the Court must evaluate whether the "burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).

As in *USA Recycling*, Miami Shores' takeover of waste collection services "will not impose any different burdens on nonlocal as opposed to local garbage haulers." *USA Recycling*, 66 F.3d at 1287. All local and nonlocal private firms are treated equally by the Ordinance: they are prohibited from providing waste collection services in Miami Shores.

Plaintiffs argue that *USA Recycling* is distinguishable because the Town of Babylon hired its garbage hauler using a bidding process that left open the possibility that an out-of-state firm could be selected, "which would actually shift a portion of the garbage collection market into interstate commerce." *Id.* at 1287. Miami Shores does not use a competitive bidding process, as it simply provides the waste collection services with its own trucks and employees. However, neither an out-of-state nor a local firm could provide the waste collection services in Miami Shores, as the Village does so itself. Therefore, the Miami Shores Ordinance "has imposed no greater burdens on nonlocal firms that it has placed on local firms." *Id.* at 1287.

In addition, the fact that Bennett may pay more for waste collection under the Ordinance does not compel a finding that the Ordinance discriminates against, or imposes an undue burden on, interstate commerce. The *USA Recycling* court noted that saving residents money by consolidating services was one benefit of the Town of Babylon's takeover of waste collection. *See id.* at 1295. However, as Miami Shores notes, the Ordinance may allow low-volume residential customers, who are more expensive to serve than high-volume commercial customers, to benefit from the lower unit costs associated with serving commercial customers. Nevertheless, even without this benefit, the mere fact that Bennett's waste collection bills may increase when the municipality provides the service does not dictate a finding that the Ordinance violates the Commerce Clause.

Assuming that the Ordinance did burden interstate commerce, other putative local benefits—including "safety, sanitation, [and]

reliable garbage service"—remain. *Id.* at 1295. The *USA Recycling* court further noted that municipalities have "legitimate—indeed, compelling" interests in taking over the garbage market. "In our multi-tiered federal system, local governments have historically borne primary responsibility for ensuring the safe and reliable disposal of waste generated within their borders—a role that Congress has expressly recognized.... Local governments must enjoy some leeway in coping with the solid waste crisis." *Id.* at 1288.

## B. The Sherman Act

Miami Shores argues that Count II of the Complaint, which asserts a claim for monopolization under the Sherman Act, should be dismissed because Miami Shores' waste-collection activities are exempt from antitrust scrutiny pursuant to the state action doctrine. Miami Shores also contends that Count II should be dismissed because Miami Shores is not a seller in the relevant market. The Court finds that Miami Shores' actions are entitled to state action immunity from the antitrust laws. Therefore, the Court need not address whether Miami Shores is a seller in the relevant market.

### 1. The State Action Doctrine

 Miami Shores contends that its actions are exempt from the federal antitrust laws under the state action doctrine enunciated in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) and *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985). When a municipal government acts pursuant to a "clearly articulated and affirmatively expressed" state policy to displace competition with regulation or monopoly public service, the state action doctrine exempts the municipality's anticompetitive activities from antitrust liability. *Town of Hallie,* 471 U.S. at 44, 105 S.Ct. 1713; *see also Bankers Ins. Co. v. Florida Residential Prop. and Cas., Joint Underwriting Ass'n,* 137 F.3d 1293, 1296 (11th Cir.1998). The municipality's anticompetitive conduct need only be a "foreseeable result" of the statutes establishing the state policy to displace competition. *Town of Hal-*

*lie,* 471 U.S. at 42, 105 S.Ct. 1713. "It is not necessary ... for the state legislature to have stated explicitly that it expected the City to engage in conduct that would have anticompetitive effects." *Id.*

The Eleventh Circuit employs a three-part test to determine whether the "clear articulation" test is satisfied. Miami Shores must establish " '(1) that it is a political subdivision of the state; (2) that, through statutes, the state generally authorizes the political subdivision to perform the challenged action; and (3) that, through statutes, the state has clearly articulated a state policy authorizing anticompetitive conduct.' " *Crosby v. Hospital Auth. of Valdosta and Lowndes County,* 93 F.3d 1515, 1532 (11th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1246, 137 L.Ed.2d 328 (1997) (quoting *F.T.C. v. Hospital Bd. of Directors of Lee County,* 38 F.3d 1184, 1187–88 (11th Cir.1994)). Plaintiffs argue that Miami Shores fails both the second and third parts of the *Crosby* test.[6]

 In support of its assertion of state action immunity, Miami Shores relies on Florida Statutes §§ 180.06(5) and 180.13(2). Florida Statutes § 180.06(5) authorizes municipalities to "provide for the collection and disposal of garbage." Florida Statutes § 180.13(2), in turn, grants municipalities the power to "establish just and equitable rates or charges to be paid to the municipality for the use of [a] utility by each person, firm or corporation whose premises are served thereby ...."

This Court concludes that Florida Statutes §§ 180.06(5) and 180.13(2) "generally authorize" Miami Shores to provide waste collection services, *see Crosby,* 93 F.3d at 1532, and also constitute a "clearly articulated and affirmatively expressed" state policy to displace competition in the area of waste collection. *See Town of Hallie,* 471 U.S. at 44, 105 S.Ct. 1713 (finding that Wisconsin statutes authorizing city to provide sewage services and to determine service area "evidence a 'clearly articulated and affirmatively expressed' state policy to displace competition with regulation"). As in *Town of Hallie,* in

---

**6.** Plaintiffs agree that Miami Shores is a political subdivision of the state, thus satisfying the first prong of the *Crosby* test.

the instant case "it is clear that anticompetitive effects logically would result from this broad authority to regulate." *Id.* 471 U.S. at 42, 105 S.Ct. 1713.

In addition, the Eleventh Circuit has previously found that similar legislative grants of authority contained in Fla. Stat. § 180.06 and related sections governing water and sewage services satisfied the state action test. *See Falls Chase Special Taxing Dist. v. City of Tallahassee,* 788 F.2d 711 (11th Cir.1986); *Auton v. Dade City,* 783 F.2d 1009 (11th Cir.1986). Thus, Miami Shores is entitled to antitrust immunity under the state action doctrine.

■ Plaintiffs argue that the state action doctrine does not immunize Miami Shores' actions from antitrust scrutiny because the Florida legislature's enactment of the Solid Waste Management Act, Fla. Stat. § 403.702 *et seq.*(the "SWMA"), establishes a policy forbidding municipal monopolization of waste processing and supporting competition in the field. Plaintiffs claim that the provisions of the SWMA encompass almost all of the waste involved in this case, and that the Ordinance, both on its face and as applied, covers all waste generated by businesses within Miami Shores. Plaintiffs thus contend that the Ordinance violates state law and policy as set forth in the SWMA, and that the general statements concerning waste processing contained in Fla. Stat. § 180 are controlled by the explicit provisions of Florida's SWMA.

Miami Shores argues that the Ordinance is in compliance with the SWMA, that the goal of the SWMA is to protect the environment, rather than to promote competition in waste collection, and that the Court need not determine whether the Ordinance technically complies with the SWMA, as long as Florida has

expressed a policy which contemplates anticompetitive behavior by the municipality.

Although Fla. Stat. §§ 180.06(5) and 180.13(2) satisfy the state action test, thereby immunizing Miami Shores' anticompetitive behavior from the federal antitrust laws, the Court finds that Florida's SWMA expresses a policy supporting competition in waste processing involving "source-separated recovered materials" (SSRMs).[7] The SWMA provides, for instance, that a local government "may not require a commercial establishment that generates source-separated recovered materials to sell or otherwise convey its recovered materials to the local government or to a facility designated by the local government...." Fla. Stat. § 403.7046(3)(1997). The SWMA also protects the right of an establishment that generates SSRMs to sell the SSRMs to a certified recovered materials dealer, as well as protecting the right of such dealers to purchase or collect such SSRMs from commercial establishments. *See id.* Other provisions of the SWMA also support competition related to SSRMs. *See id.* § 403.7046(3)(d).[8]

Miami Shores asserts in its briefs that, because the Ordinance and the SWMA are not in conflict, the Ordinance "does not prohibit Bennett ... from making private arrangements for the collection of any source-separated recyclable materials, nor does it prohibit Lazaro's ... from collecting and processing such materials." Rep. Mem. of Def. in Supp. of Mot. to Dis., at 12. The Court concludes that it need not decide whether the Ordinance is in strict compliance with the SWMA.

The Supreme Court has explained that, in the context of the state action doctrine:

> In addition to any other authority provided by law, a local government is hereby expressly authorized ... to enter into a *nonexclusive* franchise or to otherwise provide for the collection, transportation, and processing of recovered materials at commercial establishments provided that such franchise or provision *does not prohibit* a certified recovered materials dealer from entering into a contract with a commercial establishment to purchase, collect, transport, process, or receive source-separated recovered materials....
> (emphasis added).

7. The SWMA defines "recovered materials" to include "metal, paper, glass, plastic, textile, or rubber materials that have known recycling potential [and] can be feasibly recycled." Fla. Stat. § 403.703(7) (1997). "Source separated" is defined as the "recovered materials [that] are separated from solid waste where the recovered materials and solid waste are generated," and *"de minimis* solid waste ... may be included in the recovered materials." Fla. Stat. § 403.703(44) (1997).

8. Fla. Stat. § 403.7046(3)(d) provides, in pertinent part:

in order to prevent *Parker* from undermining the very interests of federalism it is designed to protect, it is necessary to adopt a concept of authority broader than what is applied to determine the legality of the municipality's action under state law. *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 372, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991).

The Court in *City of Columbia* considered South Carolina statutes that authorized a municipality to regulate the size, location and spacing of billboards. The Court rejected the argument that the municipality's regulation was not authorized if it was not, as the state statute required, adopted for a legislatively authorized purpose. The Court adopted the "broader" concept of authority for *Parker* purposes because otherwise, the federal court would " 'inevitably become[ ] the standard reviewer not only of federal agency activity but also of state and local activity whenever it is alleged that the governmental body, though possessing the power to engage in the challenged conduct, has actually exercised its power in a manner not authorized by state law.' " *Id.* 499 U.S. at 372, 113 L.Ed.2d 382 (quoting P. Areeda & H. Hovenkamp, Antitrust Law ¶ 212.3b, p. 145 (Supp.1989)).

Therefore, for state action immunity purposes, this Court will examine the authority granted to Miami Shores under a broader concept than what might be used to determine the legality of Miami Shores' actions under Florida law.

Since the Court concludes that Fla. Stat. § 180 provides the necessary state policy to displace competition, and since Miami Shores agrees that the Ordinance does not cover source-separated recyclable materials because the Ordinance and the SWMA are not in conflict, this Court will not conduct a detailed analysis of whether the Ordinance technically complies with the SWMA. Analyzed under a broad concept of authority, Miami Shores' actions are entitled to *Parker* immunity from the federal antitrust laws.

### III. *Declaratory Relief*

In Count III of their Amended Complaint, Plaintiffs seek a declaration that the Ordinance does not apply to them because Miami Shores has taken the position that the Ordinance does not apply to the collection of SSRMs. Bennett argues that Miami Shores cannot force it to use Miami Shores' waste processing services for SSRMs. Similarly, Lazaro's argues that Miami Shores cannot prevent it from collecting and processing SSRMs within Miami Shores.

As previously noted, Miami Shores contends that the SWMA and the Ordinance are not in conflict, and that the Ordinance "does not prohibit Bennett ... from making private arrangements for the collection of any source-separated recyclable materials, nor does it prohibit Lazaro's ... from collecting and processing such materials." Rep. Mem. of Def. in Supp. of Mot. to Dis., at 12. Nonetheless, because the Court has dismissed Plaintiffs' Commerce Clause and Sherman Act claims, the Court lacks subject matter jurisdiction over the state law claim for declaratory relief. *See* 28 U.S.C. § 1367(c)(3). Therefore, Count III is dismissed.

### *CONCLUSION*

Miami Shores' decision to take over the local waste collection market does not violate the Commerce Clause, and is immune from the federal antitrust laws pursuant to the state action doctrine. Therefore, the Defendant's Motion to Dismiss is GRANTED. The entire complaint is dismissed with prejudice.